**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

| | |
|---|---|
| CC METALS AND ALLOYS, LLC, <br><br> and <br><br> FERROGLOBE USA, INC., <br><br>         Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br>         Defendant, <br><br> and <br><br> OM MATERIALS (SARAWAK) SDN. BHD., <br><br>         Defendant-Intervenor. | Court No. 25-00131 <br><br> **PUBLIC VERSION** <br><br> **BPI removed from brackets on pages 2, 7-19, 21-28, 30, 31, 33-39, and 41-45** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel: (202) 991-2701

Dated: January 14, 2026

*Counsel to Plaintiffs CC Metals and Alloys, LLC, and Ferroglobe USA, Inc*

PUBLIC VERSION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

RULE 56.2 STATEMENT ............................................................................................... 1

1.  Administrative Determination to be Reviewed.................................................. 1

2.  The Issues Presented and Reasons for Contesting the Final Determination....................... 1

    A.  Whether Commerce's Use of OMSA's "New and Improved" CONNUMs Presented only at Verification Was an Abuse of Discretion and Otherwise Not in Accordance with Law. ...................................................................................... 1

    B.  Whether Commerce's Treatment of OMSA's U.S. "Onward Sales" as Constructed Export Price Transactions in the *Final Determination* was Supported by Substantial Evidence on the Record and Otherwise in Accordance with Law........................................... 3

JURISDICTION ............................................................................................................. 4

STANDARD OF REVIEW .............................................................................................. 4

STATEMENT OF FACTS .............................................................................................. 6

SUMMARY OF THE ARGUMENT .............................................................................. 17

ARGUMENT .................................................................................................................. 19

I.  COMMERCE'S DECISION TO ACCEPT OMSA'S "NEW AND IMPROVED" CONTROL NUMBER REPORTING WAS AN ABUSE OF DISCRETION ............... 19

    A.  Legal Framework........................................................................................ 20

    B.  OMSA's New CONNUMs Substantially and Unreasonably Impacted OMSA's AD Margin and Should Have Been Rejected .......................................................... 21

II.  COMMERCE'S TREATMENT OF OMSA'S U.S. ONWARD SALES AS CEP TRANSACTIONS WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN ACCORDANCE WITH LAW .......................... 31

    A.  Legal Framework ....................................................................................... 32

    B.  Commerce Should Have Treated OMSA's Onward Sales as EP Sales with the Date of Sale Set at Shipment of the Subject Merchandise to the United States............................. 35

CONCLUSION................................................................................................................ 46

# TABLE OF AUTHORITIES

## CASES

*Allied Tube and Conduit Corp. v. United States*,
    127 F. Supp. 2d 207 (Ct. Int'l Trade 2000) ...................................................... 38, 40

*Altx, Inc. v. United States*,
    167 F. Supp. 2d 1,353 (Ct. Int'l Trade 2001) ............................................................ 5

*ArcelorMittal USA, LLC v. United States*,
    302 F. Supp. 3d 1,366 (Ct. Int'l Trade 2018) ......................................................... 33

*Atlantic Sugar, Ltd. v. United States*,
    744 F.2d 1,556 (Fed. Cir. 1984) ............................................................................... 4

*Chemours Company FC, LLC v. United States*,
    443 F. Supp. 3d 1,315 (Ct. Int'l Trade 2020) ........................................................... 5

*Corus Staal BV. v. United States*,
    502 F.3d 1,370 (Fed. Cir. 2007) ............................................................................. 39

*Goodluck India Ltd. v. United States*,
    11 F.4th 1,342 (Fed. Cir. 2021) .............................................................................. 20

*Koyo Seiko Co. v. United States*,
    36 F.3d 1,565 (Fed. Cir. 1994) ........................................................................... 6, 40

*Micron Tech., Inc. v. United States*,
    117 F.3d 1,386 (Fed. Cir. 1997) ............................................................................. 20

*New American Keg. v. United States*,
    Slip Op. 21-30, 2021 WL 1206153 (Ct. Int'l Trade March 23, 2021) ............... 20, 26

*Nippon Steel Corp. v. United States*,
    337 F.3d 1,373 (Fed. Cir. 2003) .......................................................................... 4, 31

*Nucor Corporation v. United States*,
    612 F. Supp. 2d 1,264, (Ct. Int'l Trade 2019) ................................................ *passim*

*PT Asia Pacific Fibers Tbk, v. United States*,
    673 F. Supp. 3d 1,320 (Ct. Int'l Trade 2023) ........................................................... 5

*Ta Chen Stainless Steel Pipe, Inc. v. U.S.*,
    298 F.3d 1,330 (Fed. Cir. 2002) ............................................................................. 30

*Universal Camera Corp. v. N.L.R.B.*,
    340 U.S. 474 (1951) .................................................................................................. 4

# STATUTES

19 U.S.C. §§ 1516a(a)(2)(A) and (a)(2)(B)(i) ................................................. 4

19 U.S.C. § 1516a(b)(1)(B)(i) .......................................................................... 4

19 U.S.C. § 1677a(a) ......................................................................................... 32

19 U.S.C. § 1677a(b) ......................................................................................... 32

19 U.S.C. § 1677a(d)(1) .............................................................................. 44, 45

19 U.S.C. §§ 1677a(d)(2) and (3) .................................................................... 45

19 U.S.C. § 1677b(a)(1)(A) ............................................................................. 33

19 U.S.C. § 1677e(a) & (b) ....................................................................... *passim*

19 U.S.C. § 1677m(i)(1) ................................................................................... 20

28 U.S.C. § 1581(c) ............................................................................................ 4

# REGULATIONS

19 C.F.R. § 351.401(i) ................................................................................ 32, 38

# ADMINISTRATIVE DETERMINATIONS & PUBLICATIONS

*Ferrosilicon from Brazil, Kazakhstan, Malaysia, and the Russian Federation*,
   89 Fed. Reg. 31,137 (Dep't of Commerce Apr. 24, 2024) (initiation) ................................. 6, 31

*Ferrosilicon from Malaysia*,
   89 Fed. Reg. 88,010 (Dep't of Commerce Nov. 6, 2024) (prelim. determ.), *as amended*,
   89 Fed. Reg. 99,829 (Dep't of Commerce Dec. 11, 2024), and accompanying
   Preliminary Decision Memorandum (Oct. 31, 2024) ...................................................... *passim*

*Ferrosilicon From Malaysia*,
   90 Fed. Reg. 14,105 (Dep't of Commerce Mar. 28, 2025) (fin. determ.), *as amended*,
   90 Fed. Reg. 21,456 (Dep't of Commerce May 20, 2025), and accompanying Issues
   and Decision Memorandum (Mar. 21, 2025)................................................................ *passim*

*Ferrosilicon From Malaysia: Amended Final Determination of Sales at Less Than Fair Value;
   Ferrosilicon from Brazil, Kazakhstan, and Malaysia: Antidumping Duty Orders*,
   90 Fed. Reg. 21,456 (Dep't Commerce May 20, 2025) ............................................................ 1

*Polyethylene Terephthalate Resin from the Sultanate of Oman*,
   87 Fed. Reg. 75,594 (Dep't of Commerce Dec. 9, 2022) (fin. determ.)................................. 16

## RULE 56.2 STATEMENT

### 1.    Administrative Determination to be Reviewed

Plaintiffs CC Metals and Alloys, LLC and Ferroglobe USA, Inc. ("Plaintiffs" or

Petitioners") seek judicial review of the United States Department of Commerce's

("Commerce") final determination in the antidumping duty ("AD") investigation covering

ferrosilicon from Malaysia, published in the *Federal Register* on March 28, 2025.  *Ferrosilicon*

*From Malaysia*, 90 Fed. Reg. 14,105 (Dep't of Commerce Mar. 28, 2025) (fin. determ.) ("*Final*

*Determination*"), P.R. 255,[1] *as amended*, 90 Fed. Reg. 21,456 (Dep't of Commerce May 20,

2025) ("*Amended Final Determ.*"), P.R. 277, and accompanying Issues and Decision

Memorandum (Mar. 21, 2025) ("*IDM*"), P.R. 241.

The period of investigation ("POI") was January 1, 2023, through December 31, 2023.

The *Final Determination* became effective upon the publication of *Ferrosilicon From Malaysia;*

*Amended Final Determination of Sales at Less Than Fair Value; Ferrosilicon from Brazil,*

*Kazakhstan, and Malaysia: Antidumping Duty Orders*, 90 Fed. Reg. 21,456 (Dep't Commerce

May 20, 2025) ("*Order*"), P.R. 277.

### 2.    The Issues Presented and Reasons for Contesting the Final Determination

#### A.  Whether Commerce's Use of OMSA's "New and Improved" CONNUMs Presented only at Verification Was an Abuse of Discretion and Otherwise Not in Accordance with Law.

**Yes.**  OMSA fundamentally revised its reporting methodology at verification – near the

very end of the proceeding and after the record had closed for all questionnaire responses and

---

[1] Public documents in the administrative record are designated as "P.R." and confidential documents are designated as "C.R."  Business proprietary information from confidential documents is designated using square brackets and is redacted from the public version of this brief, in accordance with Rule 5(g) of the Court's Rules.

PUBLIC VERSION

requested information– resulting in entirely new control numbers or CONNUMs,[2] which Commerce inexplicably accepted, inexplicably failed to verify at the sales verification, and only partially verified at the cost verification.

OMSA's "new and improved" CONNUM reporting methodology resulted in an entirely new set of comparisons in [    ] percent of Commerce's AD analysis and had a direct, material, and cascading effect on all of OMSA's cost, home market sales, and U.S. sales databases.  It is obvious why OMSA sought to completely revise the way it reported its data after it saw the 19.48 percent amended preliminary determination margin: the AD calculations using OMSA's new CONNUMs resulted in a significantly lower AD margin.

Commerce abused its discretion when it accepted OMSA's untimely and fundamentally new data based on a wholesale methodological change presented for the first time at verification, failed to verify the new data at the sales verification, and then used those data in the *Final Determination*.  Faced with an attempt to completely change its CONNUM reporting methodology at verification, Commerce should have determined that OMSA had not acted to the best of its ability and rejected OMSA's data as patently unreliable and applied total adverse facts available, pursuant to 19 U.S.C. § 1677e(a) & (b).

---

[2] A control number or "CONNUM" is a multi-digit number whose digits represent, from first to last, the most important physical characteristics of the subject merchandise.  In a general sense it is akin to a Stock Keeping Unit or SKU.  At the start of an investigation, Commerce defines the most important physical characteristics, which it then rank-orders.  Because any given physical characteristic (size, iron level, etc.) can vary (*i.e.*, size = 1", 2", 3" etc.), for each physical characteristic (*i.e.*, each digit of a CONNUM), Commerce identifies ranges of options, which are assigned their own numerical value (*i.e.*, 1 = size of 1.0"-1.75", 2 = 1.76"-2.5", etc.).  A respondent such as OMSA identifies and reports the unique CONNUMs reflecting the subject merchandise it sold in the United States and in the home market during the period of investigation.  CONNUMs form the heart of the antidumping calculations, because they determine which U.S. and home market sales are compared to calculate the amount of dumping.  As this shows, accurate reporting of CONNUMs is critical to an investigation; flawed reporting renders the AD calculations inaccurate and unreliable.

**B. Whether Commerce's Treatment of OMSA's U.S. "Onward Sales" as Constructed Export Price Transactions in the *Final Determination* was Supported by Substantial Evidence on the Record and Otherwise in Accordance with Law**

**No.** Throughout the investigation OMSA consistently reported 100% of its U.S. transactions that involved "onward sales"[3] as export price ("EP") transactions, and in fact, reported *all* of its U.S. sales as EP sales. Commerce followed its standard practice and used the earlier of invoice date or shipment date for each transaction in the *Preliminary Determination*. However, in an abrupt change, in the *Final Determination* Commerce treated the vast majority of the onward sales as constructed export price ("CEP") transactions. No party advocated that Commerce treat OMSA's onward sales as CEP transactions, and Plaintiffs were given no opportunity during the investigation to argue against such a change.

This decision caused fundamental changes to the U.S. sales database used in the AD calculations, because it changed the date considered to be the date of sale for many sales, which then fell outside the time period used as the period of investigation. As a result of its abrupt and unfounded change, Commerce completely eliminated multiple U.S. sales from the database and its calculation of OMSA's AD margin, representing an extremely large quantity of subject merchandise sold to the United States.

Apart from causing multiple sales to fall outside the POI, Commerce's abrupt and unsupported change moved the goalposts in another, equally critical way. To wit, at the same time sales were eliminated from the database, it is likely other sales should have been brought into the database used for the AD calculations. Compounding its error, however, Commerce

---

[3] "Onward sales" in this case were U.S. sales in which, pursuant to a sales contract involving OMSA, the U.S. trader, and the ultimate U.S. customer, the prices for the goods were finalized after the trader delivered the merchandise to the customer.

3

never asked OMSA to report the *other* U.S. sales involving onward sales that would fall within

the POI if these sales had been treated as CEP sales instead of EP sales.

In the *Final Determination*, Commerce should have used a complete dataset derived from

the POI, treated all of OMSA's sales as EP sales, followed its standard practice of using the

earlier of shipment or invoice date for such sales, and used the AD calculation methodology it

used in the *Preliminary Determination*.  Commerce instead calculated OMSA's AD margin

using an incomplete database.  The result was an inaccurate AD margin that is based on

incomplete data.  Commerce's determination to treat OMSA's onward U.S. sales as CEP sales is

not supported by substantial evidence on the record and not in accordance with law.

## JURISDICTION

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c), as this action

was commenced under 19 U.S.C. §§ 1516a(a)(2)(A) and (a)(2)(B)(i).

## STANDARD OF REVIEW

In reviewing Commerce's AD determinations, the Court of International Trade ("CIT")

"shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by

substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).  To satisfy the "substantial evidence" standard, Commerce must take into

account "the entire record, including whatever fairly detracts from the substantiality of the

evidence."  *Atlantic Sugar, Ltd. v. United States*, 744 F. 2d 1,556, 1,562 (Fed. Cir. 1984); *see

also Nippon Steel Corp. v. United States*, 337 F. 3d 1,373, 1,379 (Fed. Cir. 2003).  The Court

may not sustain Commerce's determination "without taking into account contradictory evidence

or evidence from which conflicting inferences could be drawn."  *Universal Camera Corp. v.

N.L.R.B.*, 340 U.S. 474, 487 (1951).

4

In order to satisfy the "substantial evidence" standard, Commerce must also provide a reasoned explanation for its determination. To do so, it must "make the necessary findings and have an adequate evidentiary basis for its findings," which requires "examin{ing} the relevant data and articulat{ing} a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Chemours Company FC, LLC v. United States*, 443 F. Supp. 3d 1,315, 1,321 (Ct. Int'l Trade 2020) (citing *In re NuVasive, Inc.,* 842 F. 3d 1,376, 1,382 (Fed. Cir. 2016)). Commerce "must address significant arguments and evidence which seriously undermines its reasoning and conclusions." *Altx, Inc. v. United States*, 167 F. Supp. 2d 1,353, 1,374 (Ct. Int'l Trade 2001).

In the *Final Determination*, Commerce, for the first time on the record, *sua sponte* converted several of OMSA's reported U.S. EP sales to CEP sales. The result was that each of those sales fell out of the transactions determined to be part of the POI based on their date of sale. When "Commerce does not address an issue until its final determination, or fails to follow legal requirements intended to put parties on notice of Commerce's findings prior to making its final determination," the CIT has held that "Commerce unreasonably deprived the parties of a fair opportunity to raise their objects or comments, and thus," the "exhaustion doctrine" does "not bar the parties from making their arguments for the first time before the Court." *PT Asia Pacific Fibers Tbk, v. United States*, 673 F. Supp. 3d 1,320, 1,330 (Ct. Int'l Trade 2023). "As previous cases have held, prior to any final determination a respondent must be given a fair opportunity to comment on a change in Commerce's position of which it was not aware, particularly when the change in position results in a wholesale change in the outcome." *Id.* (citing *Jacobi Carbons AB v. United States*, 992 F. Supp. 2d 1,360, 1,367 (Ct. Int'l Trade 2014), *aff'd* 619 F. App'x 992 (Fed. Cir. 2015)). Accordingly, the doctrine of exhaustion of

PUBLIC VERSION

administrative remedies does not bar this Court from considering if Commerce's treatment of

OMSA's U.S. EP sales to CEP sales was supported by substantial evidence on the record.

Furthermore, in analyzing Commerce's AD calculations, the Court should be cognizant

of "Commerce's overarching obligation to determine dumping margins as accurately as

possible." *Nucor Corporation v. United States*, 612 F. Supp. 2d 1,264, 1,308 (Ct. Int'l Trade

2019) ("*Nucor Corp*.") (citing *NTN Bearing Corp. v. United States*, 74 F.3d 1,204, 1,208 (Fed.

Cir. 1995); *Koyo Seiko Co. v. United States*, 36 F. 3d 1,565, 1,573 (Fed. Cir. 1994)).

## STATEMENT OF FACTS

On March 28, 2024, Plaintiffs filed an AD petition alleging that ferrosilicon from

Malaysia and three other countries was being, or were likely to be, sold in the United States at

less than fair value.  Commerce initiated its AD investigation on April 17, 2024.  *See*

*Ferrosilicon from Brazil, Kazakhstan, Malaysia, and the Russian Federation*, 89 Fed. Reg.

31,137 (Dep't of Commerce Apr. 24, 2024) (initiation) ("*Initiation Notice*"), P.R. 22.

Commerce selected OM Sarawak Sdn. Bhd ("OMSA", "OMS", or "OMM"), a producer

of subject merchandise, and another Malaysian entity as respondents for individual examination

and issued its initial antidumping questionnaire.  On July 2, 2024, OMSA filed its response to the

first section (section A) of Commerce's questionnaire.  Letter from Baker McKenzie to Sec'y of

Commerce, *OMSA's Section A Response* (July 2, 2024) ("*OMSA Sec. AQR*"), P.R. 55; C.R. 16.

In its section A questionnaire response, OMSA reported that it used an affiliated

Malaysian entity, OM Materials (S) Pte Ltd. ("OMS"), to manage all of its U.S. sales, and that it

sold subject merchandise to the United States during the POI via two sales channels.  *Id.* at 1.

PUBLIC VERSION

One set of sales were made "through OMS to an unaffiliated trader on a [       ]⁴ basis." *Id.* at 15.

The other set of sales were made "through OMS to an unaffiliated trader on a [   ]⁵ basis." *Id.*

OMSA further explained that for the first group of sales, "OMS ships the merchandise to {sic}

the [

]" *Id.*

In response to question about its sales process, OMSA explained that it sells all of its

merchandise intended for shipment to OMS, and then "OMS sells to U.S. traders, and may do so

through two channels . . .." *Id.* at 19. It explained that if its U.S. sales were "on a [       ] basis,

OMS will deliver to the U.S. port [

] to end users in the

United States." *Id.*

OMSA explained that it did not sell subject merchandise through unaffiliated resellers or

to affiliated customers, and that the ultimate unaffiliated customers were always identified

"through the location of the customer on OMSA or OMS' invoices." *Id.* at 20 and 22. Further,

OMSA explained that even through prices for merchandise sold to the ultimate U.S. customers

"may change after the initial agreement," those price changes were always "contemplated in the

initial sales contract." *Id.* at 20.

---

⁴ [

]

⁵ [


]

With respect to its invoicing practice, OMSA explained that for [      ] sales it issues

[

].  *Id.* at 21-22.

In exhibits A-1 and A-8 to OMSA's section A questionnaire response OMSA reported

that all of its sales to the United States were [          ] and explained that for [        ] sales

"[

]."  *Id.* at Exhibits A-1 & A-8.

On July 18, 2024, OMSA submitted its initial section B (reporting sales in Malaysia) and

C (reporting sales in the United States) questionnaire responses.  Each of these responses is

accompanied by databases reporting OMSA's sales using the CONNUMs it identifies based on

its books and records.  As discussed in note 2 *supra*, CONNUMs are at the heart of the AD

analysis, because they determine which sales are compared to calculate the amount of dumping.

With respect to its sales in the United States, OMSA stated that during the POI OMSA

made EP sales to unaffiliated trading companies in the United States through its affiliate, OMS,

and that all of its U.S. sales were EP sales.  Letter from Baker McKenzie to Sec'y of Commerce,

*OMSA's Section B and C Initial Questionnaire Responses* (July 18, 2024) ("*OMSA Sec. BCQR*"),

P.R. 91; C.R. 67, at Sec. C, 1.

In response to another question, OMSA reiterated that all of its U.S. sales of subject

merchandise were EP sales, and in response to a third question it emphasized that all of the sales

were "EP sales to unaffiliated U.S. customers through unaffiliated trading companies," and it

8

stressed that "{n}one of these sales were on a CEP basis." *Id.* at Sec. C, 5 & 12. In addition, OMSA explained that all of its U.S. sales were "sold on a per shipment basis. Therefore, each sale is shipped in one shipment, and each sale was fully shipped during the POI." *Id*. at Sec. C, 20.

Commerce subsequently issued a supplemental questionnaire requesting further information about both OMSA's reported CONNUMs and its U.S. sales. On October 8, 2024, OMSA submitted its supplemental section A-C questionnaire response. Letter from Baker McKenzie to Sec'y of Commerce, *OMSA's Sections A-C Supplemental Questionnaire Response* (Oct. 08, 2024) ("*OMSA's Supplemental Sec. A-C*"), P.R. 129; C.R. 143.

With respect to OMSA's reported CONNUMs, Commerce asked OMSA to "{i}dentify and provide the internal documents you used to define the CONNUM characteristics," to which OMSA responded that "OMS used the information identified within the [

            ] section in its sales contracts to define the CONNUM characteristics for each sale. OMS provided a sample extract below from the contract included in Exhibit SQA-1." *OMSA's Supplemental Sec. A-C* at 12. In other words, OMSA explained that it had reported its CONNUM coding using information from its sales contracts in both its original and supplemental responses.

With respect to its U.S. sales, Commerce requested further information about certain transactions and how the ultimate prices were determined for those sales. In response to those questions, OMSA explained that for some U.S. sales, [                                    ], there are [              ] between the [                  ] that is issued upon shipment and the [                                    ] based on "differences in the [

            ]" but that all prices, whether in the [                    ],

9

are based on a formula, with many of those prices tied to the [

]. *Id.* at 10.  For example, for one sale referenced by Commerce in its

questions, OMSA explained that there were formulaic changes in price in accordance with the

terms of the sales contract because [


]. *Id.* at 11.  In other words, OMSA explained that even if the ultimate price

paid by the end user was [                                      ], the material

terms of the contracts, such as the pricing formula using the [          ], were established

before shipment of the merchandise.

        OMSA also explained that for all U.S. sales "where OMS ships merchandise [


    _    _    _    _          ]" *Id.* at 7 (emphasis added).  In Exhibit SQA-1 to the supplemental

questionnaire response, OMSA provided "an example of a [

        ] that OMS issues to [                    ]." *Id.*

        Then, in an explanation that contradicted its previous explanation of the [          ]

sales, OMS stated that it "sells the product to [   _    _

        ].  OMS works with [


    ]" *Id.* at 16 (emphasis added).

        Exhibit SQA-1 provided an example of such a transaction in which all of the commercial

terms are set before exportation to the United States, even if certain prices are modified after

exportation.  *Id.* at Exhibit SQA-1.  In the document, the [          ] sale price example was

not tied to the [              ] but instead was referred to as an [

].  *Id.* at Appendix A to Exhibit SQA-1.

In another exhibit to the supplemental questionnaire response, Exhibit SQA-3, OMSA

provided another example using a different unaffiliated trader, [                    ], with the

sales contract stating that the [

].  *Id.* at Exhibit SQA-3.

In comments prior to the preliminary determination, Plaintiffs argued that Commerce

should use the original invoice date for the date of sale for each transaction, because

OMM has provided contracts on the record that indicate that [

]  In this situation, the adjustments are
legitimate post-sale price expenses and not adjustments to the starting
price.

Letter from The Bristol Group PLLC to Sec'y of Commerce, *Pre-Prelim Comments Concerning

OMM's Continued Deficiencies in the Supplemental A-D Questionnaire Responses* (Oct. 24,

2024), P.R. 144; C.R. 235, at 2-3.

On November 6, 2024, Commerce issued its *Preliminary Determination*.  *Ferrosilicon

from Malaysia*, 89 Fed. Reg. 88,010 (Dep't of Commerce Nov. 6, 2024) (prelim. determ.)

("*Preliminary Determination*"), P.R. 167, *as amended*, 89 Fed. Reg. 99,829 (Dep't of Commerce

Dec. 11, 2024) ("*Amended Preliminary Determination*"), P.R. 186, and accompanying

Preliminary Decision Memorandum (Oct. 31, 2024) ("*PDM*"), P.R. 149.

With respect to the date of sale for all of OMSA's U.S. transactions, Commerce stated

that "the record of this investigation indicates that the earlier of shipment and invoice date are the

11

dates when the material terms of sale are set, and thus, we used the earlier of invoice date and shipment date as the date of sale in both the home and U.S. markets for the preliminary determination." *PDM* at 8. *See also* Memorandum from Jacob Waddell, International Trade Compliance Analyst, AD/CVD Operations, Office VI, through Erin Kearney, Program Manager, AD/CVD Operations, Office VI, to the File, *Preliminary Analysis Memorandum for OM Material Sarawak Sdn. Bhd.* (Oct. 31, 2024) ("*Preliminary Analysis Memorandum*"), P.R. 156; C.R. 243 at 2 ("Consistent with 19 CFR 351.401(i) and Commerce's practice, we set the date of sale to the earlier of the shipment date or the invoice date"). Furthermore, Commerce explained that "{a}ll of OMSA's sales to the United States were EP sales because the first sale to an unaffiliated party was made before the date of importation and the CEP methodology was not otherwise warranted based on the facts on the record." *PDM* at 9.

Commerce was required to issue a revised preliminary determination because it had made serious errors in its calculations. In the *Amended Preliminary Determination*, Commerce revised the preliminary AD margin to 19.48 percent, nearly triple the 6.91 percent rate originally calculated. *Amended Preliminary Determination*, 89 Fed. Reg. at 99,830. Commerce continued to treat OMSA's U.S. sales as reported by OMSA, EP sales, in its calculations of OMSA's AD weighted-average margin.

From November 4 to November 8, 2024, Commerce verified OMSA's cost questionnaire responses. *OMSA Cost Verification Report* (Feb. 12, 2025), P.R. 224; C.R. 374, and Letter from Baker McKenzie to Sec'y of Commerce re: *Ferrosilicon from Malaysia: OMSA's Cost Verification Exhibits* (Nov. 15, 2024) ("*Cost Verification Exhibits*"), P.R. 174; C.R. 264 – 271.

From January 13 to January 16, 2025, Commerce verified OMSA's sales questionnaire responses. *OMSA Sales Verification Report* (Feb. 12, 2025), P.R. 220; C.R. 361. Contrary to all

of its earlier explanations on the record, OMSA stated for the first time at this verification that

Commerce should use "the date of the final invoice" for its U.S. [          ] sales as the date

of sale, because it now claimed that "the material terms of sale are not set until the final invoice."

*Id.* at 6.  It argued that Commerce should use the final invoice date as the date of sale whether the

final price was "based on the CRU index price" or whether it was "based on the onward sale in

the United States (*i.e.* the price at which the trader ultimately sells the product)."  *Id.* at 7.  As

noted previously, OMSA reported all of its U.S. sales as EP sales and Commerce verified

numerous [          ] sales – [    ] onward sales and [        ] with prices tied to the CRU-

index – identified as SEQUs [                    ], noting "no discrepancies" in OMSA's

reporting of them as EP sales.  *Id.* at 13-15.

On February 12, 2025, OMSA submitted a revised U.S. sales database.  Letter from

Baker McKenzie to Sec'y of Commerce, *OMSA's Submission of Revised Sales and Cost*

*Databases* (Feb. 12, 2025) ("*OMSA Post-Verification Databases*"), P.R. 219; C.R. 357, at

Exhibit C-1 (Revised 2).  The revised U.S. sales database showed that although the

[          ] sales represented only [      ] out of OMSA's [    ] U.S. transactions, those sales

represented [                ] of the overall sales quantity, or [      ] percent of the total

quantity of all sales reported in the sales database.  *Id.* at 5-9.  Moreover, OMSA still classified

all of its sales as EP transactions.  *Id.*

With respect to OMSA's reported CONNUMs, on the first day of both the cost and sales

verification, OMSA presented Commerce with an entirely new CONNUM reporting

methodology that fundamentally changed [

                    ] new CONNUMs and completely different AD comparisons.  Instead

of using sales contracts to identify the information needed to report its CONNUMs as it had done

throughout the investigation, OMSA now wanted to use production testing reports as the basis of constructing its CONNUMs.  *See OMSA Cost Verification Report*, at 3; *OMSA Sales Verification Report,* at 2-3; Letter from Baker McKenzie to Sec'y of Commerce, *OMSA's Resubmission of Sales and Cost Verification Minor Corrections* (Feb. 10, 2024) ("*OMSA's Minor Corrections*"), P.R. 217, C.R. 353, at VE-1 & SVE-1.

At the sales verification, Commerce inexplicably accepted OMSA's new CONNUM reporting methodology, but never correctly checked that it was accurate.[6]  Instead, for <u>all</u> of the sales traces[7] performed by Commerce at the sales verification, Commerce only verified the *original* CONNUMs reported by OMSA, and not OMSA's completely *revised* CONNUMs.  *See* Letter from Baker McKenzie to Sec'y of Commerce, *OMSA Sales Verification Exhibits* (Jan. 24, 2025) ("*OMSA Verification Exhibits*"), P.R. 205, C.R. 328 – 342, at SVE-9 – SVE-28.[8]

---

[6] As discussed below, Commerce did review certain limited aspects of the reported "new and improved" CONNUM methodology allegedly based on production test reports at OMSA's cost verification.  *OMSA Cost Verification Report* at 3, 9-11, P.R. 224; C.R. 374; *Cost Verification Exhibits* at CVE-1 (Attachment E) & CVE-7, P.R. 174; C.R. 264 & C.R. 267.

[7] A "sales trace" is an exercise in which the Commerce verification team selects a sale and reviews all underlying source documents and entries in a company's books and records related to it.  As part of a sales trace, Commerce will check and confirm the accuracy of a respondent's CONNUM reporting methodology.  The source materials are subsequently placed on the record as verification exhibits.

[8] Specifically, page two of each of these sales trace exhibits contains a SAS printout showing all variables for the sales observation in question, including the CONNUM and individual product characteristics.  For each and every one of these 20 sales traces, the CONNUM is the one originally reported by OMSA.  For example, one of these is CONNUM [                    ], which had by far the largest production quantity, largest U.S. sales quantity, and second largest HM sales quantity according to OMSA's original reporting.  CONNUM [                    ] does not appear in OMSA's revised, post-sales verification databases that incorporated its new CONNUM reporting methodology.

On February 25, 2025, Plaintiffs filed their case brief, arguing that Commerce should reject OMSA's new CONNUMs. Letter from The Bristol Group PLLC to Sec'y of Commerce, *Case Brief* (Feb. 25, 2025) ("*Petitioners' Case Br.*"), P.R. 230; C.R. 377, at 4-13.

First, OMSA's new CONNUMs and methodology resulted in the [        ] replacement of [        ] CONNUM that OMSA reported throughout the investigation before verification. *Id.* at 5.

Second, [      ] CONNUMs reported were "completely new and different CONNUMS than what OMSA had reported previously." *Id.* at 9-10. Plaintiffs argued that Commerce should reject OMSA's entirely new CONNUM reporting methodology introduced at verification and apply adverse facts available to OMSA's calculations, pursuant to 19 U.S.C. §§ 1677e(a)(2) and (b). *Id.* at 4 & 11.

On March 3, 2025, Plaintiffs filed their rebuttal brief. Letter from The Bristol Group PLLC to Sec'y of Commerce, *Petitioners' Rebuttal Brief* (Mar. 3, 2025) ("*Petitioners' Rebuttal Brief*"), P.R. 232; C.R. 379, at 1-3. In response to arguments made by OMSA in its case brief, Plaintiffs argued that the record evidence showed "that the material terms of sale are set by the earlier of when the merchandise shipped from OMSA's facility, or when the first invoice was issued." *Id.* at 1. Accordingly, Commerce should have continued to follow its standard practice and use the earlier of the shipment date or invoice date for OMSA's sales using an unaffiliated reseller, as it did in the *Preliminary Determination*.

In response to OMSA's arguments about the material terms of sale, Plaintiffs explained that the "mere fact that the [                            ] does not materially alter the terms set in the contract." *Id.* at 3. They explained that "the sales contract [                ]," and therefore, consistent with its

practice, Commerce should focus on the date the material terms of the contract are set – not a later date when prices go up or down based certain formulas or previously-established terms.  *Id.* at 4.  In support, Plaintiffs cited to *Polyethylene Terephthalate Resin from the Sultanate of Oman*, 87 Fed. Reg. 75,594 (Dep't of Commerce Dec. 9, 2022) ("*PET Film*") (fin. determ.).  In that case, Commerce concluded that "prices set by formula may be established on the date of agreement of the formula, not the date that the formula triggers a price-related event." *Petitioners' Rebuttal Brief* at 4 (quoting *PET Film IDM* at Comment 1).

OMSA also filed its Rebuttal Brief on March 3, 2025.  Letter from Baker McKenzie to Sec'y of Commerce, *OMSA's Rebuttal Brief* (Mar. 3, 2025), P.R. 231; C.R. 378, at 1-12.  OMSA argued that all of its CONNUM modifications introduced at verification were minor and that the change had "no practical effect" on Commerce's calculations.  *Id*. at 4.

On March 28, 2025, Commerce issued the *Final Determination*.  Commerce agreed with Plaintiffs that when OMSA's U.S. sales were tied to the CRU index price through a formula, the date of sale was the contract date because "there is nothing more for the parties to negotiate." *IDM* at 16 (citing *Solid Urea from the Russian Federation*, 75 Fed. Reg. 51,440 (Dep't of Commerce Aug. 20, 2010), and accompanying issues and decision memorandum at Comment 3). However, when OMSA's U.S. sales were concluded between the trader and the end user based on onward sales in the United States, Commerce decided that the material terms of the transactions were not finalized until the final invoice date and used the final invoice date as the date of sale.  *Id.* at 17.

Commerce also decided, *sua sponte*, that even though OMSA had consistently reported all of its U.S. transactions as EP sales and affirmatively stated that none of its sales were CEP sales, OMSA's onward U.S. sales should be treated as CEP transactions.  Commerce concluded

because the onward sales were finalized in the United States, they occurred in the United States after importation and therefore, based on the plain language of the statute, those sales should be properly classified as CEP sales. *IDM* at 17.

Commerce's unilateral reassignment of [    ] of the [                    ] sales from EP to CEP sales and resulting wholesale change to the date of sale for those transactions resulted in all [    ] of those sales – constituting [       ] percent of OMSA's U.S. sales – falling outside of the POI and being completely eliminated from the AD calculations.  Memorandum from Carolyn Adie, International Trade Compliance Analyst, and Jacob Waddell, International Trade Analyst, AD/CVD Operations, Office VI, through Erin Kearney, Program Manager, AD/CVD Operations, Office VI, to the File, *Final Analysis Memorandum for OM Materials (Sarawak) Sdn. Bhd* (Mar. 21, 2025), P.R. 245; C.R. 384 at 2-3; *Amended Final Analysis Memorandum for OM Materials (Sarawak) Sdn. Bhd* (Apr. 22, 2025) ("*Final Analysis Memorandum*"), P.R. 269; C.R. 408, C.R. 412 at Attachment 6 (Margin Program Output).

Between the use of the OMSA's "new and improved" CONNUMs and the elimination of [     ] percent of OMSA's U.S. sales from its AD margin calculations, the result was a drastic reduction in OMSA's calculated margin, which dropped from 19.48 percent to 5.10 percent. *Amended Preliminary Determination*, 89 Fed. Reg. at 99,830; *Amended Final Determination*, 90 Fed. Reg. at 21,457.

## SUMMARY OF THE ARGUMENT

Commerce made two decisions in the *Final Determination* that were unreasonable, unsupported by substantial evidence on the record, and otherwise unlawful.

First, extremely late in the investigation, at verification OMSA completely changed the way it reported the most critical data in the case – its CONNUMs.  As discussed in footnote 2 above, CONNUMs are the heart and soul of an accurate AD calculation.  OMSA's new

CONNUMs had a significant effect on OMSA's AD margin calculations, making clear the company's incentive to seek such a radical and unwarranted change.

Commerce abused its discretion in accepting such a significant methodological change at verification from OMSA as a "minor correction" – completely altering how a company defines the very products being investigated can hardly be described as a "minor" change any more than could changing the key of Beethoven's Fifth Symphony from C minor to F sharp – and Commerce's determination to use OMSA's new CONNUMs in its AD margin calculations was in no way supported by substantial evidence on the record or otherwise in accordance with law.

Commerce's flawed decision should be remanded with the direction that it reject the new CONNUMs offered up by OMSA at verification and either apply total adverse facts available, pursuant to 19 U.S.C. § 1677e(a) & (b), or, at bare minimum, continue to use OMSA's CONNUMs reported in its questionnaire responses and used in the *Preliminary Determination*.

In addition, although OMSA's commercial experience was to treat all of its U.S. sales similarly, whether they were [                    ] or [      ] sales, Commerce determined to use a different date of sale for some of the [              ] transactions for the first time in the *Final Determination* and, *sua sponte*, redesignated those sales as CEP sales. Commerce did this despite the fact that OMSA had reported all of its U.S. sales as EP sales and affirmatively stated that none of its sales were on a CEP basis. The result was that more than half of OMSA's U.S. sales were eliminated from OMSA's AD margin calculations.

Commerce had limited information on the record with respect to those U.S. sales, yet it made a drastic decision that had an oversized impact on the AD margin calculated for OMSA in the *Final Determination*. Commerce's decision to change the date of sale for those transactions, and to treat them as CEP sales, was not supported by substantial evidence on the record or

lawful, and should be sent back to Commerce to apply a date of sale based on the date of

shipment for those transactions and treat those transactions as EP sales.

## ARGUMENT

### I. COMMERCE'S DECISION TO ACCEPT OMSA'S "NEW AND IMPROVED" CONTROL NUMBER REPORTING WAS AN ABUSE OF DISCRETION

In both the *Preliminary Determination* and the *Amended Preliminary Determination*,

Commerce calculated OMSA's AD margin using the information OMSA reported. *Preliminary*

*Analysis Memorandum*, P.R. 156; C.R. 243, at Attachment 5; C.R. 248. The preliminary AD

margin calculation was based on comparisons of [     ] CONNUMs, defined by nine individual

product characteristics, that applied to [   ] of the subject merchandise exported by OMSA to the

United States. *Id.* [   ] comparisons of OMSA's sales in Malaysia and in its sales in the United

States used those [    ] CONNUMs. *Id.*

However, on the first day of verification, OMSA presented an entirely new CONNUM

reporting methodology and claimed its radical changes to be "minor." *See OMSA Sales*

*Verification Report*, P.R. 220; C.R. 361, at 2-3; *OMSA Minor Corrections*, P.R. 217; C.R. 353, at

SVE-1. OMSA admitted that it had "relied on the specifications listed in the sales contracts to

report the CONNUMs" in all of its filings before verification, but in preparing for verification, it

had determined that it would be "more accurate" to completely change how it determined its

control numbers and instead use "test certificates." *See OMSA Sales Verification Report,* at 2.

Commerce inexplicably accepted OMSA's new method for defining OMSA's

CONNUMS, resulting in the creation of *entirely new* CONNUMs that applied to [    ] percent of

OMSA's home market and U.S. sales, as well as a revised cost database. *See OMSA Minor*

*Corrections*, P.R. 217; C.R. 353, at SVE-1, 1 (OMSA submitting a "revised home market

database," a "revised U.S. sales database," and a "revised cost database").

Commerce's acceptance of this significant change in OMSA's data was a surprise, as Commerce has consistently stated that verification is not intended to be an opportunity for submission of new factual information to correct a reporting methodology.  *See, e.g.*, Letter from Erin Kearney, Program Manager, AD/CVD Operations, Office VI, to OM Materials (Sarawak) Sdn Bhd, *Less-Than-Fair-Value Investigation of Ferrosilicon from Malaysia: Verification Agenda* (Jan. 6, 2025), P.R. 199, at 2; *Goodluck India Ltd. v. United States*, 11 F.4[th] 1,342, 1,343 (Fed. Cir. 2021) ("Commerce's typical practice is to accept corrective information at verification only for minor corrections to information already on the on the record.") (citations removed).

Commerce's decision to accept OMSA's new CONNUM methodology and resulting CONNUMs at verification, and then subsequently use those CONNUMs in calculating OMSA's AD margin in the *Final Determination*, was an abuse of discretion, and we respectfully request this Court remand this issue to Commerce for further reconsideration.

### A.    Legal Framework

Section 19 U.S.C. § 1677m(i)(1) requires Commerce to "verify all information relied upon in making a final determination in an investigation."  The standard in reviewing Commerce's verification procedures is one of "abuse of discretion."  *Micron Tech., Inc. v. United States*, 117 F.3d 1,386, 1,396 (Fed. Cir. 1997).

That said, as the CIT held in *New American Keg. v. United States*, Slip Op. 21-30, 2021 WL 1206153 (Ct. Int'l Trade March 23, 2021) ("*New American Keg*"), when a respondent submits alleged "minor corrections" at verification and the result of using the new data is a significant change in the company's calculated AD margin, it is an "abuse of discretion" if Commerce uses those data in its calculations but does not "verify those corrections."  *Id.* at *16.

The revisions to the CONNUM data provided OMSA at verification were not "minor." Even if they had been individually minor, the use of the new data so late in the investigation, which Commerce failed to verify at the sales verification, had a significant impact on OMSA's calculated AD margin.

Accordingly, in accordance with *New American Keg*, Commerce's use of those data in its calculations of OMSA's AD margin was an abuse of discretion. Rather than blindly accept and use them in the *Final Determination*, Commerce should have rejected them and either applied total AFA, in accordance with 19 U.S.C. § 1677e(a) and (b), or continued to use the CONNUMs reported in OMSA's questionnaire responses and applied by Commerce in the *Preliminary Determination*.

**B.     OMSA's New CONNUMs Substantially and Unreasonably Impacted OMSA's AD Margin and Should Have Been Rejected**

OMSA reported its original [       ] CONNUMs on July 18, 2024, in response to its initial Section B & C questionnaire responses. As explained above, those were the CONNUMs Commerce used to calculate a weighted-average AD margin for OMSA in the *Preliminary Determination*. *OMSA Sec. B and C*, P.R. 91; C.R. 67 at Exhibits B-1 & C-1; *Preliminary Determination*, 89 Fed. Reg. at 88,010, P.R. 167, *as amended*, 89 Fed. Reg. at 99,829, P.R. 186.

It was not until months later, on November 4, 2024, and January 13, 2025, at OMSA's cost and sales verifications, for the first time in the investigation, that OMSA offered up its new CONNUM coding methodology, which completely removed and replaced [       ] CONNUMs used by Commerce in its calculations. *See OMSA Cost Verification Report*, P.R. 224; C.R. 374; *OMSA Sales Verification Report*, P.R. 220; C.R. 361. The CONNUM replacements were neither minor nor insignificant, and it was unreasonable and an abuse of discretion for Commerce to

21

accept the new CONNUMs at verification and then use them in calculating OMSA's weighted-average AD margin in the *Final Determination*.

As explained above, Plaintiffs were not silent on this issue and challenged OMSA's new methodology for determining the CONNUMs used in its AD margin calculations in their case brief, pointing out this major revision to OMSA's data affected all three databases (cost, home market sales, and U.S. sales). *Petitioners' Case Br.*, P.R. 230; C.R. 377, at 1. Plaintiffs explained that it was wholly new, unsolicited, and a fundamental methodological change that affected [      ] of OMSA's reported CONNUMs. *Id.* at 5. Further, the use of the new CONNUMs would decrease the margin by [    ] percentage points, a relative [    ] percent drop, which showed that OMSA's revised CONNUM methodology was not "minor" in any way. *Id.* at 10.

To demonstrate significance of the changes introduced by OMSA at verification, Plaintiffs provided a chart which showed the differences between the old CONNUMs and the new CONNUMs. *Petitioners' Case Br.* at 10.

| CONNUMs | OMM02 (Oct 11, 2024) | | | OMM03 (Feb 12, 2025) | | |
|---|---|---|---|---|---|---|
| | PRODQTY | QTYH | QTYU | PRODQTY | QTYH | QTYU |
| [ | | | | | | ] |
| Totals | [ | | | | | ] |

The left-most column of the chart identifies all of the CONNUMs reported by OMSA using either its original or new methodology. The middle column shows OMSA's total production, home market sales, and U.S. sales quantities for each CONNUM as reported in the databases submitted by OMSA prior to verification, using the original methodology accepted in the *Preliminary Determination*. Finally, the last column shows OMSA's total production, home market sales, and U.S. sales quantities for each CONNUM as reported in the post-verification databases submitted by OMSA. The chart reflects differences and similarities between the old and new CONNUMs.

The chart shows, for example, that a new CONNUM created by OMSA's revised methodology, CONNUM [                    ], which comprised the vast majority of OMSA's U.S. sales ([                         ]), matched to [          ] the

corresponding home market ("HM") sales quantity than matched the previously reported

CONNUM, ([                                    ]).

Because OMSA's revisions impacted [    ] percent of its CONNUMS in both sales and

cost data, it was highly inaccurate for OMSA to claim that the CONNUM coding changes were

"minor." *Id* at 11.  Instead, by replacing the CONNUMs OMSA reported in both its original

section B & C questionnaire responses, and then again in its supplemental questionnaire

responses, OMSA's new methodology was clearly anything but a timely "minor" correction to

its reported information.

Plaintiffs therefore argued that not only should Commerce reject OMSA's new

CONNUM methodology, but that it should apply total adverse facts available, pursuant to 19

U.S.C. § 1677e(a) & (b), to OMSA's calculations.  *Petitioners' Case Br*. at 2 -11.

In its rebuttal brief, OMSA claimed that its offered changes "cannot be characterized any

way other than minor." *OMSA's Rebuttal Br*. at 4.  OMSA claimed that its new CONNUMs did

"not affect OMSA's sales reporting," because it claimed that each sale that was assigned to one

of the original CONNUMs could be assigned "one-to-one" to a new CONNUM "without any

reporting changes." *Id.* at 5.

In the *Final Determination*, Commerce responded to the parties' arguments on this issue,

but in doing so, made statements which were simply factually incorrect.  For example,

Commerce stated that "no new CONNUMs were created," which as shown above was clearly

wrong. *IDM* at 9.  In fact, [        ] CONNUMs applied to Commerce's calculations in the

*Preliminary Determination* were replaced with new CONNUMS.

Furthermore, Commerce stated that despite the CONNUM changes, "the sales reporting

was not affected, *e.g.*, all sales originally reported as CONNUM A remain reported for revised

24

CONNUM A." *IDM* at 9. However, regardless if products shifted entirely from one CONNUM to another, it is without question that the new CONNUM methodology created new comparisons in Commerce's calculations between different models in the home market and different models sold in the United States.

Moreover, Commerce's characterization of there being a one-to-one CONNUM shift (*i.e.,* the total quantity of one of the old CONNUMs shifting in its entirety to one of the new CONNUMs) is obviously incorrect, as the home market sales quantities between the old and new reported CONNUMs changed as a result of the use of the new CONNUMs. This change is reflected in the SAS programming, and is evident from the resulting decrease in the margin by [    ] percentage points from the comparisons used in in the *Preliminary Determination* AD margin calculations and the comparisons used in the *Final Determination* AD margin calculations, as Plaintiffs pointed out in their case brief. *Petitioners' Case Br.*, P.R. 230; C.R. 377, at 10. *See also Final Analysis Memo*, P.R. 269; C.R. 408, at Attachment 6, C.R. 412.

In addition, Commerce stated that just "because a large number of transactions are affected by a correction does not necessarily render a correction significant," and that "although OMSA's revision of four product characteristics in its CONNUM" methodology "affected a significant number of CONNUMs, the error itself did not have a significant impact or call into question the integrity of OMSA's reported data." *IDM* at 8 & 9. That conclusion was also incorrect, again, as Plaintiffs pointed out that the result was a change in the margin of [    ] percentage points. *Petitioners' Case Br.*, P.R. 230; C.R. 377, at 10. To an injured domestic industry, such a large change to the AD margin calculations is "significant," and it is extremely concerning that Commerce would claim otherwise.

Finally, Commerce claimed that it was "able to verify the information OMSA relied upon for its CONNUM revision." *IDM* at 8 & n.22 (citing *OMSA's Sales Verification Report*, at 2-3; *OMSA's Cost Verification Report*, at 3). However, this statement is also factually incorrect insofar as Commerce claims it verified the new CONNUMs at the sales verification. Commerce, in fact, verified *none* of the new CONNUMs at the sales verification.

Instead, for each of the 20 sales traces Commerce conducted at the sales verification, Commerce verified the CONNUMs *originally* reported by OMSA. *OMSA Verification Exhibits*, P.R. 205; C.R. 328 – 342, at SVE-9 – SVE-28. For example, Commerce verified CONNUM [                    ], which had by far the largest production quantity, largest U.S. sales quantity, and second largest HM sales quantity (according to OMSA's original reporting), yet CONNUM [                    ] does not appear in OMSA's revised, post-sales verification databases that were based on its new CONNUM reporting methodology. *OMSA Post-Verification Databases*, P.R. 219; C.R. 357, at Exhibit C-1 (Revised 2). Accordingly, Commerce accepted the new methodology and new CONNUMs offered by OMSA at the sales verification, but then verified the original, different CONNUMs used to calculate OMSA's AD margin in the *Preliminary Determination*. *OMSA Verification Exhibits,* P.R. 205; C.R. 328 – 342, at SVE-9 – SVE-28.

In *New American Keg.*, Slip Op. 21-30 at *16, the CIT held that when a respondent submits alleged "minor corrections" at verification and the result of using the new data is a significant change in the company's calculated AD margin, it is an abuse of discretion if Commerce uses that data in its calculations but does not verify those corrections. In that litigation, the use of the new data accepted at verification resulted in an AD margin change from 2.01 percentage points to below *de minimis*. *Id.* at *15. Because of that resulting change to the

margin, the CIT held that it was unreasonable for Commerce to take proposed corrections "on faith" at verification because a "respondent that waits until after Commerce issues a preliminary decision has the opportunity and the motive to engage in informed gamesmanship in response to that decision." *Id*. at *16. The Court held that to "reasonably guard against that possibility, Commerce should – to borrow an expression from President Reagan – trust but verify such corrections at least where, as here, such corrections are dispositive." *Id*.

In this case, Commerce abused its discretion when it accepted an entirely new CONNUM methodology at the sales verification, which affected [    ] of Commerce's sales comparisons and the cost database, with a resulting [    ] percent margin change, and then did not verify any of the new CONNUMs at the sales verification.

The fact that Commerce conducted the cost verification using OMSA's "new and improved" CONNUM reporting methodology, but then verified the CONNUM information in each and every sales trace at the sales verification using OMSA's *original* methodology, creates an obvious discordance on the record.

Furthermore, although the record shows that OMSA's sales records reflected certain information on which OMSA relied for its initial reported CONNUM methodology, while its production test reports showed *different* information that OMSA relied on for the allegedly "new and improved" CONNUM methodology, that inconsistency is not evidence that the production test reports information was more *accurate*. It is just proof that the numbers were *different* and that OMSA's internal record-keeping was internally inconsistent and unreliable. It was unreasonable for Commerce to blindly accept OMSA's claim at verification that the production information submitted so late in the proceeding was more *accurate*, especially when it was

evident that the use of that untimely information would result in a significant difference in OMSA's AD margin.

In fact, at the cost verification, Commerce did not fully verify the production test report data upon which OMSA's "new and improved" CONNUM methodology was based. While OMSA stated that the CONNUM revisions submitted at the cost and sales verifications were supported by its production test reports (a characterization that Commerce blindly accepted), the record evidence does not show that this conclusion is true for all of the chemical elements at issue. For example, while [                    ] appear on all the test reports verified by Commerce, [                    ] do not. *See* Letter from Baker McKenzie to Sec'y of Commerce, *Ferrosilicon from Malaysia: OMSA's Resubmission of Sales and Cost Verification Minor Corrections* (Feb. 10, 2025), P.R. 217; C.R. 353 at SVE-1, Attachment E (pp. 3, 7-10, and 13 ).[9] Instead, OMSA's reporting for [                    ] is largely, and perhaps wholly dependent on a [

                                                    ]. *Id.* at 4. The provenance of this [          ] is totally unknown, not addressed in the Cost Verification Report, and it bears no [                    ].

Accordingly, while Commerce claimed that it fully verified the "new and improved" CONNUM methodology at the cost verification, the record evidence shows that in fact Commerce officials only verified some of the information in the documents upon which that methodology relied. As noted, the record of the verification of the production test reports appears to be incomplete. Thus, while there is no question that the sales and production numbers

---

[9] Specifically, of the [     ] test reports Commerce collected at verification, [                    ].

were *different*, and that Commerce did, in fact, verify that a *difference* existed between the sales and production documents, the record of the cost verification does not support that the CONNUM methodology submitted at verification and based on the production test reports was more *accurate* than the timely-submitted CONNUM methodology based on OMSA's sales information.

It is obvious that once OMSA realized that it could obtain a smaller AD margin than the margin calculated in the *Preliminary Determination* using the production test reports, it determined to report that information for the first time to Commerce at verification. Commerce did not verify the new CONNUMs at the sales verification, and it appears its verification of the new methodology and the information it relied upon was incomplete at the cost verification. It was therefore an abuse of Commerce's discretion to accept OMSA's new CONNUMs at verification and use them in calculating OMSA's AD margin calculations.

Furthermore, the incorrect statements and conclusions made by Commerce in the *Final Determination* also demonstrate that Commerce abused its discretion when it accepted OMSA's new CONNUM methodology at verification and used the resulting new CONNUMs to calculate OMSA's AD margin. If anything, as Plaintiffs argued in their brief, OMSA's statements at verification on this issue indicate that OMSA itself knew that the CONNUMs that it reported in its questionnaire and supplemental questionnaire responses were inaccurate. *Petitioners' Case Br.* at 10. Such a belief does not justify Commerce accepting untimely and significant new information for the first time at verification. Instead, Commerce should have rejected the new information and applied total AFA to OMSA's margin calculations.

Pursuant to 19 U.S.C. §§ 1677e(a)(1) & (2)(A) – (D), Commerce shall apply facts available when necessary information is not available on the record, if an interested party has

withheld information that was requested by Commerce, if an interested party fails to provide necessary information by the deadlines required by Commerce, if an interested party significantly impedes a proceeding, or if the information provided cannot be verified. Because OMSA did not provide necessary, accurate, timely and significant CONNUM data throughout the investigation until verification, its failure to provide such information impeded the investigation and the application of facts available was warranted.

Furthermore, 19 U.S.C. § 1677e(b) allows Commerce to apply an adverse inference if Commerce determines that an interested party did not act to the best of its ability in providing the requested information. The record is clear that when it came to OMSA's original [      ] CONNUMs, OMSA did not act to the best of its ability in providing that data in its questionnaire and supplemental questionnaire responses.

The burden of reporting complete and accurate responses to Commerce's questionnaires, and creating an adequate record, rests on the party in possession of the necessary information. *Ta Chen Stainless Steel Pipe, Inc. v. U.S.*, 298 F. 3d 1,330, 1,336 (Fed. Cir. 2002). There is nothing more fundamental to Commerce's AD calculations than the CONNUMs which it uses to compare U.S. sales to home market sales. When that information is inaccurate, Commerce's AD margin calculations are inaccurate as well. Furthermore, as shown by this very record, when CONNUMs are modified or replaced, there is a cascading effect that changes all of the cost and the sales databases. *See OMSA Minor Corrections*, P.R. 217; C.R. 353, at SVE-1, 1 (OMSA submitting a "revised home market database," a "revised U.S. sales database," and a "revised cost database").

Commerce should not have just rejected the new CONNUMs offered at verification, but it also should have determined that OMSA did not act to the best of its ability and applied AFA.

*See Nippon Steel Corp. v. U.S.*, 337 F. 3d 1373, 1383 (Fed. Cir. 2003) (noting that the application of an adverse inference is warranted if a party has failed to cooperate to the best of its ability, "regardless of motivation or intent"). Had Commerce applied AFA, the appropriate rate would have been the petition rate of 162.66 percent. *See Initiation Notice*, 89 Fed. Reg. at 31,140, P.R. 22.

In light of Commerce's abuse of discretion, Plaintiffs respectfully request that this Court remand the issue to Commerce to reject OMSA's revised CONNUM methodology and, pursuant to 19 U.S.C. § 1677e(a) & (b), apply the petition rate of 162.66 percent to OMSA.

In the alternative, if the Court holds that the application of AFA to OMSA is not warranted, Plaintiffs request that the Court, at minimum, reject OMSA's revised CONNUM methodology as not a minor correction and use the [     ] CONNUMs applied in calculating OMSA's AD margin in the *Preliminary Determination*. As explained above, unlike the new CONNUMs, Commerce verified OMS's original CONNUMs at the sales verification. *See OMSA Verification Exhibits*, P.R. 205; C.R. 328-342, at SVE-9 – SVE-28.

In either case, Plaintiffs request that this Court remand this issue to Commerce, as its acceptance of a new, significant, and unverified methodological change in OMSA's CONNUMs at the sales verification, and then subsequent use of that information in calculating OMSA's AD margin in the *Final Determination*, was an abuse of discretion and not supported by substantial evidence on the record or otherwise in accordance with law.

## II. COMMERCE'S TREATMENT OF OMSA'S U.S. ONWARD SALES AS CEP TRANSACTIONS WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ON THE RECORD OR OTHERWISE IN ACCORDANCE WITH LAW

OMSA reported all of its U.S. sales as EP sales and affirmatively stated that none of its sales were CEP sales. In the *Preliminary Determination*, Commerce followed its standard

practice of using the earlier of shipment or invoice date as the date of sale for all of its U.S. sales.

In the *Final Determination*, however, Commerce determined that the final invoice date should be

the date of sale for OMSA's onward U.S. sales, and, despite OMSA's reporting, Commerce

further determined to treat all of those transactions as CEP sales. These decisions resulted in a

massive amount of OMSA's sales falling out of the POI and being removed from Commerce's

calculations of OMSA's AD margin.

Commerce's determination to change the date of sale for those transactions and treat

them as CEP sales was unreasonable and not supported by substantial evidence on the record or

otherwise in accordance with law. Accordingly, we request this Court to remand this issue to

Commerce for further reconsideration.

### A. Legal Framework

Under the statutory definition of "Export Price," EP is "the price at which the subject

merchandise is first sold (or agreed to be sold) ***before the date of importation*** by the producer or

exporter of the subject merchandise outside of the United States ***to an unaffiliated purchaser in***

***the United States*** or to an unaffiliated purchaser for exportation to the United States. 19 U.S.C.

§ 1677a(a) (emphases added).

Under the statutory definition of "Constructed Export Price," CEP is defined as "the price

at which the subject merchandise is first sold (or agreed to be sold) ***in the United States before***

***or after the date of importation by or for the account of the producer or exporter of such***

***merchandise*** or by a seller affiliated with the producer or exporter, as adjusted under subsections

(c) and (d)." 19 U.S.C. § 1677a(b) (emphasis added).

The date of sale is key to determining whether a transaction is an EP or CEP sale.

Commerce's date of sale regulation, 19 C.F.R. § 351.401(i), states that in determining the

appropriate date of sale for its analysis, Commerce should select the date that "reflects the date

on which the exporter or producer establishes the material terms of sale."  Selecting the correct

date of sale is crucial, because it is the date of sale of transactions that determines the universe of

sales that occurred during the POI (and therefore are considered by Commerce in its

calculations) and ensures proper comparisons between the U.S. export, or constructed export,

prices and the normal value.  *See* 19 U.S.C. § 1677b(a)(1)(A) (defining the "normal value" as

"the price {of the foreign like product} at a time reasonably corresponding to the time of the sale

used to determine the export price or constructed export price").  *See also ArcelorMittal USA,

LLC v. United States*, 302 F. Supp. 3d 1,366, 1,370 (Ct. Int'l Trade 2018) ("The date of sale

therefore defines the universe of sales that fall within Commerce's {POI}, and that are subject to

Commerce's less than fair value determination").

      For all of OMSA's U.S. sales, OMSA used unaffiliated traders located in the United

States.  For its [          ] sales to the United States, OMSA's contracts with the unaffiliated

traders listed the traders as the [          ] but also indicated that the U.S. unaffiliated traders

would [                                                                      ].  *OMSA's

Supplemental Sec. A-C* at SQA-1 & SQA-3, P.R. 129; C.R. 144-145.

      For some of those sales, as Commerce acknowledged in the *IDM*, the price of the

merchandise sold to the ultimate U.S. purchasers was "fixed to the CRU index price for a stated

period."  *IDM* at 16.  As Commerce acknowledged in the *IDM*, "where contract terms allow for

price adjustments (in the United States) based on specified published indices," Commerce will

"use the earlier of shipment or invoice date as the date of sale" because "price adjustments made

pursuant to such specific formulas, based on outside factors beyond the parties' control and

agreed to in a sales contract, do not change the date of sale to a later date, because the parties do

not retain any discretion to set prices after the date of contract." *IDM* at 16 (citing *Emulsion Styrene-Butadiene Rubber from Mexico*, 64 Fed. Reg. 14,872, 14,879 (Dep't of Commerce Mar. 29, 1999) (fin. determin.) and accompanying issues and decision memorandum at Cmt. 3; *Solid Urea from the Russian Federation*, 75 Fed. Reg. 51,440 (Dep't of Commerce Aug. 20, 2010) (fin. determ.) and accompanying Issues and Decision Memorandum at Cmt. 3).

Accordingly, in the *IDM*, for OMSA contracts to the United States with prices for the ultimate U.S. customers tied to the CRU index and determined after importation to the United States, consistent with Commerce's "formulaic pricing" practice, Commerce used the date of shipment as the date of sale and treated those sales as EP sales (as reported by OMSA). *Id.* at 16.

At issue in this litigation is the other set of U.S. sales made by OMSA – the onward U.S. sales. Specifically, Plaintiffs challenge: 1) Commerce's decision to use a different date of sale for the onward sales than it used in the *Preliminary Determination*; 2) Commerce's decision to treat those sales as CEP sales for the first time in the *Final Determination*, although they were not reported as such and no one argued for such treatment; 3) Commerce's removal of those sales from OMSA's AD calculations; and, if Commerce insisted on treating the onward sales as CEP sales; 4) Commerce's failure to request that OMSA report other potential onward sales that would have fallen into the POI under Commerce's new CEP determination.

When considering the appropriate date of sale, Commerce has a well-established practice of looking to "the parties' actual course of conduct, as well as the parties' expectations concerning the transaction . . . ." *Nucor Corp.*, 612 F. Supp. 2d at 1308. The record establishes that OMSA considered those sales to be finalized upon shipment, similar to how it considered its sales tied to the CRU index. *See OMSA Sec. BCQR* at Sec. C, 20. Accordingly, Commerce

should have treated all of OMSA's U.S. sales the same – as EP sales using the earlier of

shipment date or invoice date as the date of sale.

### B. Commerce Should Have Treated OMSA's Onward Sales as EP Sales with the Date of Sale Set at Shipment of the Subject Merchandise to the United States

The record establishes that OMSA used the same procedures and paperwork in all of its

[          ] U.S. sales, whether those sales involved prices tied to the CRU index or prices

determined in discussions between the unaffiliated traders and ultimate U.S. customers. *See*

*OMSA's Sec. AQR*, P.R. 55; C.R. 16, at 21-22. Indeed, the record shows that OMSA treated all

of its U.S. sales essentially the same, which is the reason OMSA reported all of its U.S.

transactions to Commerce as EP sales in its sales database and in its supplemental

questionnaires, and repeatedly indicated in its questionnaire responses that all of its U.S. sales

were EP sales and not CEP transactions. *See, e.g., OMSA Sec. BCQR*, P.R. 91; C.R. 67, at Sec.

C, 5 & 12. Commerce should have considered this relevant and important record evidence when

making its date of sale and CEP determinations, but it did not analyze those facts in the *Final*

*Determination*. Accordingly, its decision to treat the onward sales as CEP transactions was

unreasonable and introduced inaccuracies into OMSA's calculated AD margin.

To be clear, OMSA exported subject merchandise to the United States using three types

of U.S. sales during the POI. For the first group of sales, OMSA's U.S. sales made on a [    ]

basis, Commerce reasonably used the earlier of invoice date or date of shipment as the date of

sale in the *Final Determination*, and considered those sales to be EP sales, as reported by

OMSA. *IDM* at 16.

For the second group of U.S. sales, [          ] sales with prices tied to the CRU

index, Commerce also reasonably used the date of shipment as the date of sale, in accordance

with Commerce's "formulaic pricing" practice. Commerce's use of shipment date for those

35

transactions was consistent not only with Commerce's past treatment of such sales in prior cases, but also consistent with OMSA's own treatment of all its U.S. sales. *Id.* at 16-17.

For the final batch of U.S. sales, OMSA's [    ] onward sales transactions were also

[           ] sales, however, Commerce treated them differently in the *Final Determination* from the manner in which OMSA treated those sales and the other [    ] U.S. sales, in the normal course of business. *Id.* at 17. Although the onward sale contracts stated either that the final price would be [                                          ] and be [

] or that [


], there is no evidence that OMSA was [

] or [                ] in any way. *OMSA's Supplemental Sec. A-C,* P.R. 129; C.R. 144 & 145, at Exhibits SQA-1 and SQA-3. Instead, the record shows that OMSA always treated those transactions the exact same, formulaic way it treated its other [           ] sale transactions with prices tied to the CRU-index – as EP sales with all material terms set at the time of shipment.

For example, OMSA reported that each of its U.S. [           ] sales used [



]. *OMSA Sec. AQR,* P.R. 55; C.R. 16, at 21-22.

Furthermore, all of OMSA's U.S. [           ] sales were shipped to the U.S. port with the trader [

]. *Id.* at Exhibits A-1 & A-8.

In addition, for all [            ] sales, the unaffiliated trader [

            ]. *Id.* Such [                ] for [

    ] is entirely consistent with the [

        ] EP sales transactions.

Further, OMSA reported that for all OMSA's U.S. [            ] sales, the sale was

[                                                                    ]

and not [                        ], although OMSA then claimed in its responses that it sold

the merchandise to the [            ] in truth, with the U.S. trader [

            ] *OMSA's Supplemental Sec. A-C*, P.R. 129; C.R. 143, at 16.

Furthermore, OMSA reported that <u>all</u> of its U.S. sales were "sold on a per shipment basis,

with each sale "shipped in one shipment" and "fully shipped during the POI." *OMSA Sec.

BCQR*, P.R. 91; C.R. 67, at Sec. C, 20. In other words, the record shows that OMSA's practice

and procedures treated <u>all</u> of its U.S. sales during the POI the same – as final and complete sales

at the time of shipment.

Accordingly, it is illogical that Commerce determined the date of sale for some of

OMSA's U.S. [            ] sales as the date of shipment, while for others as the date of the

final invoice, when the record reflects that OMSA, itself, did not consider the material terms of

sale to change after the subject merchandise was imported into the United States.

In the Statement of Administrative Action accompanying the Uruguay Round

Agreements Act, an authoritative expression of Congressional intent,[10] Congress "expressed its

intent that, for antidumping purposes, the date of sale be flexible so as to accurately reflect the

---

[10] 19 U.S.C. § 3511(a) (approval by Congress of the Statement of Administrative Action).

true date on which the material elements of sale were established." *Allied Tube and Conduit Corp. v. United States*, 127 F. Supp. 2d 207, 216 (Ct. Int'l Trade 2000) (citing the Statement of Administrative Action, H.R. Doc. No. 103-316 (1994) at 810). Although Commerce's regulations provide that the use of a final invoice date is the presumptive date of sale, they allow Commerce to use another date "if (Commerce) is satisfied that a different date better reflects the date on which the exporter or producer established the material terms of sale." 19 C.F.R. § 351.401(i).

As noted above, in determining the appropriate date of sale in a given case, Commerce has a well-established practice of looking to "the parties' actual course of conduct, as well as the parties' expectations concerning the transaction." *Nucor Corp.*, 612 F. Supp. 2d at 1,308. OMSA's conduct on the record reflects a singular "course of conduct" and set of expectations; OMSA consistently treated its onward U.S. sales, like all of its other U.S. sales, as if the material terms were finalized at shipment.

Furthermore, Commerce itself treated the onward sales as EP sales in the *Preliminary Determination* and concluded that "the earlier of shipment and invoice date are the dates when the material terms are set." *PDM* at 8.

In addition, Commerce verified [     ] of OMSA's onward sales, and for each verified transaction Commerce indicated that it found "no discrepancies." *OMSA Sales Verification Report*, P.R. 220; C.R. 361, at 12-15 (the onward sales were identified as SEQUs [

]). As each transaction had been reported by OMSA as an EP sale, Commerce's sales verification report therefore indicated that Commerce had verified "no discrepancies" with that designation. In other words, Commerce verified that these were EP sales. This was in contrast

to statements made, but not verified, by OMS at verification to Commerce officials based on the

onward sales contracts that "material terms of sale are not set until the final invoice." *Id.* at 6.

Accordingly, Plaintiffs argued in their administrative rebuttal brief that the "mere fact

that the [                    ]," as set forth at the date of shipment, [                              ]

did "not materially alter the terms set in the contract." *Petitioners' Rebuttal Br.*, P.R. 232; C.R.

379, at 3.

Nonetheless, Commerce disagreed and found that the final invoice date was the

appropriate date of sale for OMSA's onward sales and, to the surprise of the parties, determined

that those sales were CEP sales and therefore did not fall within the POI. *IDM* at 17.

As the Federal Circuit held in *Corus Staal BV. v. United States*, 502 F.3d 1,370, 1,376

(Fed. Cir. 2007), a U.S. sale is considered an EP or CEP sale depending on the point in the

transactions in which there "is mutual assent to the material terms (price and quantity)."

Although that generally means if prices changes in the United States between a party acting "by

or for the account of the producer or exporter" and an ultimate customer then the sale will be

treated as a CEP transaction, there is an exception to that presumption under Commerce's

"formulaic pricing" practice if the price changes are tied to a published price-index formula, as

Commerce explained in the *IDM*. *See IDM* at 16. In that situation, Commerce may consider the

earlier of invoice or contract date as the date of sale and may treat the transaction as an EP sale.

*See IDM* at 16.

Although Commerce generally has discretion to determine the date of sale of different

transactions, "there is no area in which any government agency has 'absolute,' unfettered

discretion." *Nucor Corp.*, 612 F. Supp. 2d at 1,303-1,304 (citing *Beardmore v. Dep't of

Agriculture*, 761 F.2d 677, 679 (Fed. Cir. 1985)).

It is understandable that once OMSA pointed to its onward sales contracts at verification and claimed that final prices were not established until OMSA issued its final invoices, Commerce considered the merits of using the date of the final invoice as the date of sale. However, those contract terms, alone, do not make up the entire administrative record and as the CIT has noted, "Commerce has used a date other than invoice date as the date of sale in numerous cases in the past, notwithstanding changes in price or other material contract terms." *Id.* at 1,306 (noting that even Commerce itself has stated that "a single change in price does not automatically disqualify contract date from the selection as the proper date of sale").

As the CIT held in *Nucor Corp*., the key factors Commerce should have considered in changing the date of sale for these transactions was whether: 1) the shift to the final invoice date for the onward sales in the investigation reflected the "meeting of the minds of the material terms of sale" given the substantial evidence on the record; 2) that shift resulted in a calculation of OMSA's AD margin "on a fair and equitable basis;" and 3) the ultimate result of the change to Commerce's calculations satisfied "Commerce's overarching obligation to determine dumping margins as accurately as possible." *Id.* at 1,308 (citing *NTN Bearing Corp. v. United States*, 74 F. 3d 1,204, 1,208 (Fed. Cir. 1995); *Koyo Seiko Co. v. United States*, 36 F. 3d. 1,565, 1,573 (Fed. Cir. 1995); and *Allied Tube and Conduit Corp. v. United States*, 127 F. Supp. 2d 207, 218-219 (Ct. Int'l Trade 2000)). The changes to Commerce's calculation of OMSA's AD margin in the *Final Determination* met none of these requirements.

First, despite the language of the onward contracts that suggested OMSA had the ability to challenge or disagree with the final price determined between the unaffiliated trader and the ultimate customer, there is no evidence on the record that OMSA was involved in any

discussions with the unaffiliated trader or the ultimate U.S. customer on price, or did anything but just automatically issue the final invoice upon the instructions of the unaffiliated trader.

In other words, all record evidence suggests that OMSA treated the onward [              ] sales in exactly the same, formulaic manner as it treated its [              ] sales to the unaffiliated traders using the CRU-price index – as EP sales with the date of shipment as the date of sale. *See, e.g., OMSA Sec. BCQR*, P.R. 91; C.R. 67, at Sec. C, 20.

This would explain why OMSA reported all of its sales to Commerce as EP sales, and why OMSA affirmatively reported in its questionnaire responses that there were no CEP sales. *Id.* at Sec. C, 1, 5 & 12.

Thus, the record reflects that OMSA considered the date of sale to be the same for both sets of [              ] sales, even though, in both sets of transactions, the prices changed between shipment and the final invoice.

Furthermore, there is no record evidence indicating the understanding or the expectations of the unaffiliated trading company or the ultimate customers for either the sales using CRU-index prices or prices for merchandise pursuant to the onward sales. Notably, as described above, Commerce verified several of the onward sales transactions, yet OMSA provided no record evidence reflecting any price negotiations or expectations in the United States between the unaffiliated trader and ultimate customer, nor any evidence of OMSA's involvement in any such discussions.

For its part, Commerce requested no information pertaining to the price discussions between the unaffiliated traders and ultimate customers and verified no information that addressed the expectations of those parties concerning the appropriate date of sale for the onward sales. Thus, OMSA, the respondent in this case and the price discriminator for purposes of

calculating the AD margin, is the <u>only</u> party for which the record establishes an understanding or expectation of the appropriate date of sale for those transactions, and the record reflects that OMSA considered the date of sale to be the same for all of its [          ] sales to the United States, no matter the form of the sales contract.

Second, Commerce's change of the date of sale from the date of shipment to the date of the final invoice from the *Preliminary* to the *Final Determination* was neither "fair," nor "equitable." Instead, it was a surprise at the end of the proceeding that radically changed the results of the investigation.

Record evidence supports the conclusion that Commerce's change of OMSA's sales from EP to CEP in the *Final Determination* was unfair and inequitable. The most obvious evidence, of course, is that in its questionnaire responses OMSA reported all of its U.S. transactions as EP sales and stressed that none of its U.S. sales were CEP sales. *See, e.g., OMSA Sec. BCQR*, P.R. 91; C.R. 67, at Sec. C, 1, 5 & 12.

Furthermore, there is no information on the record with regard to the communications, negotiations or interactions between the unaffiliated traders and the ultimate U.S. customers.

In addition, no one (including OMSA) ever advocated for Commerce to treat those sales as CEP sales throughout the investigation, Commerce verified certain onward sales as reported, *i.e.*, as EP sales, as having "no discrepancies," and Plaintiffs were surprised to see Commerce determine that those sales were CEP sales*, sua sponte*, in the *Final Determination*. *OMSA Sales Verification Report*, P.R. 220; C.R. 361, at 13-15.

Finally, as a result of that determination, [      ] percent of OMSA's total U.S. sales from its AD calculations were eliminated from Commerce's calculations, resulting in a drastic change in margin from 19.48 percent in the *Amended Preliminary Determination* to 5.10 percent in the

*Amended Final Determination*. *Amended Preliminary Determination*, 89 Fed. Reg. at 99,830, P.R. 186, *Amended Final Determination*, 90 Fed. Reg. at 21,457, P.R. 277; *Final Analysis Memorandum*, P.R. 269; C.R. 408, at Attachment 6, C.R. 412.

None of these facts suggest that Commerce's determination to revise the date of sale for the onward sales, turn those transactions into CEP sales, and remove the [      ] of sales from OMSA's AD margin calculations was either fair or equitable for the Petitioners in this investigation.

Third, rather than increase the accuracy of Commerce's AD calculations in this investigation, Commerce's determination actually introduced inaccuracies into OMSA's AD margin calculations. OMSA reported a universe of sales for the POI based on dates of sale that aligned with EP sales. *See OMSA Sec. BCQR*, P.R. 91; C.R. 67, at Exhibit C-1. Accordingly, Commerce's calculation of an AD margin for OMSA at the *Preliminary Determination* using all of OMSA's reported U.S. sales was accurate and comprehensive. *Preliminary Analysis Memorandum*, P.R. 156; C.R. 243, at Attachment 5; C.R. 248. Commerce should have continued to use that calculation methodology in the *Final Determination*.

In the alternative, had Commerce wanted OMSA to continue to have a complete dataset from which to calculate an AD margin while also treating onward sales as CEP transactions, Commerce needed to issue a supplemental questionnaire to OMSA and request that OMSA report all its onward sales as CEP sales, including those sales with contracts and shipments that preceded the POI. In that case, just as a large percentage of CEP sales shipped during the POI fell out of OMSA's AD calculations at the end of the POI as a result of Commerce's changes in the *Final Determination*, it is possible that onward sales that were shipped before the POI would have fallen within the POI as well.

Instead, Commerce's last-minute decision to treat the reported onward sales as CEP transactions resulted in the removal of sales representing a [        ] of the products subject to the investigation and undermined the accuracy of OMSA's AD margin calculations.  It makes little sense that in the *Preliminary Determination* Commerce calculated OMSA's AD margin on the basis of transactions covering [        ] metric tons of subject merchandise throughout the POI, while in the *Final Determination*, Commerce calculated OMSA's AD margin on the basis of transactions covering only [        ] metric tons of subject merchandise.  *Preliminary Analysis Memorandum*, P.R. 156; C.R. 243, at Attachment 5, C.R. 248; *Final Analysis Memorandum*, P.R. 269; C.R. 408, at Attachment 6, C.R. 412.

It is simply illogical to claim that such a determination satisfied "Commerce's overarching obligation to determine dumping margins as accurately as possible."  *Nucor Corp.*, 612 F. Supp. 2d at 1,308.  Accordingly, Plaintiffs request that this Court remand this issue to Commerce with instructions to recalculate OMSA's AD margin, treating OMSA's onward sales as EP sales and using the earlier of the shipment date or invoice date for the date of sale for those transactions.

In the alternative, if the Court affirms Commerce's treatment of the onward sales at issue as CEP transactions, the Court should instead remand the issue to Commerce with instructions that OMSA update its U.S. sales database to include all onward sales that shipped before the POI and for which prices were concluded between the unaffiliated trading company and ultimate customer during the POI.  Presuming as a result of such a remand certain CEP sales would be added to OMSA's database for determining an AD margin, pursuant to 19 U.S.C. § 1677a(d)(1), Commerce would then be required on remand to gather additional information, including information from the unaffiliated traders, to make necessary statutory adjustments to OMSA's

44

CEP sales in recalculating an AD margin for OMSA.  Commerce would then also need to provide Plaintiffs the opportunity to comment on the new CEP-related information, issue supplemental questionnaires, and then verify the accuracy and reliability of the information onsite at OMSA and the unaffiliated traders.

Specifically, section 1677a(d)(1) states that "the price used to establish constructed export price shall be reduced by" a series of "expenses generally incurred by or for the account of the producer or exporter" in "selling the subject merchandise (or subject merchandise to which value has been added)," including commissions for the selling the subject merchandise in the United States, credit expenses, and selling expenses that the seller pays on behalf the purchaser. In addition, 19 U.S.C. §§ 1677a(d)(2) and (3) provide that certain costs and profit should also be reduced from the price used to establish CEP.

Further, to be assured that the record is complete and accurate, if the Court remands the issue to include additional CEP sales in recalculating OMSA's AD margin, Commerce should also gather further information on the communications and negotiations between OMSA's unaffiliated resellers and ultimate customers for all U.S. [          ] sales and then verify that information.

To be clear, Plaintiffs advocate that on remand Commerce recalculate OMSA's AD margin using the methodology that it applied in the *Preliminary Determination*, as that calculation was straightforward, reliable and accurate.  However, if the Court affirms Commerce's treatment of the onward sales as CEP sales, then in the alternative we request that the Court order Commerce gather and verify the above-described additional data on remand and, in accordance with that additional information, make the necessary statutory adjustments to OMSA's AD margin calculations.

In either case, Commerce's determination in the *Final Determination* to treat OMSA's onward U.S. sales as CEP transactions was neither supported by substantial evidence or otherwise in accordance with law, nor fair and equitable, and should be remanded back to Commerce for reconsideration.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court hold that Commerce's *Final Determination* is not supported by substantial evidence on the record or otherwise in accordance with law and remand the *Final Determination* to Commerce for reconsideration consistent with the opinion of this Court, and order such other relief that the Court deems just and proper.

Respectfully submitted,

Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.
**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel: (202) 991-2701

Dated: January 14, 2026          ***Counsel to Plaintiffs CC Metals and Alloys, LLC, and Ferroglobe USA, Inc.***

46

**CERTIFICATE OF COMPLIANCE WITH WORD COUNT LIMITATION**

I hereby certify that according to the word count function of Microsoft Word, which was used to prepare the brief, the foregoing brief contains 13,969 words and therefore complies with word count limitation in the Standard Chambers Procedures.

Adam H. Gordon, Esq.
Benjamin J. Bay, Esq.
Scott D. McBride, Esq.

**THE BRISTOL GROUP PLLC**
1707 L Street NW
Suite 1050
Washington, DC 20036
Tel:  (202) 991-2701

*Counsel to Plaintiffs CC Metals and Alloys, LLC, and Ferroglobe USA, Inc.*