**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:   THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

| | | |
|---|---|---|
| CC METALS AND ALLOYS, LLC, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| FERROGLOBE USA, INC., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Consol. Court No. 25-00131 |
| | ) | **PUBLIC VERSION** |
| UNITED STATES, | ) | (redactions at pages 3, 4, 6, 12, 13 |
| | ) | 18, 19, 20) |
| *Defendant,* | ) | |
| | ) | |
| and | ) | |
| | ) | |
| OM MATERIAL (SARAWAK) SDN. | ) | |
| BHD. | ) | |
| | ) | |
| *Defendant-Intervenor.* | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
RULE 56.2 MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

BRETT A. SHUMATE
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

OF COUNSEL:                                                CLAUDIA BURKE
SAMUEL CHILDERSON                              Deputy Director
Attorney                                                         Commercial Litigation Branch
Office of the Chief Counsel                          Civil Division
  for Trade Enforcement & Compliance       Department of Justice
U.S. Department of Commerce                     P.O. Box 480
                                                                      Ben Franklin Station
                                                                      Washington, DC 20044
                                                                      Telephone: (202) 305-7568
                                                                      Fax: (202) 307-0972
                                                                      Email: claudia.burke@usdoj.gov

Dated: April 24, 2026                                  *Attorneys for Defendant*

**TABLE OF CONTENTS**

STATEMENT PURSUANT TO RULE 56.2 ................................................................................2

    I.      Administrative Determination Under Review ...........................................................2

    II.    Issues Presented for Review ....................................................................................2

STATEMENT OF FACTS ....................................................................................................2

SUMMARY OF ARGUMENT ...........................................................................................7

ARGUMENT .......................................................................................................................8

    I.      Standard of Review ..................................................................................................8

    II.    Commerce's Acceptance of OMSA's Corrected CONNUMs Was Not an Abuse of Discretion or Unlawful ...........................................................................................9

    III.   Commerce's Treatment of OMSA's U.S. Onward Sales Is Supported by Substantial Evidence and Otherwise in Accordance with Law ..............................16

CONCLUSION...................................................................................................................26

# TABLE OF AUTHORITIES

**Cases**                                                                                                            **Page(s)**

*AG der Dillinger Hüttenwerke v. United States*,
   156 F.4th 1314 (Fed. Cir. 2025) ............................................................................... 13

*Allied Tube and Conduit Corp. v. United States*,
   132 F. Supp. 2d 1087 (Ct. Int'l Trade 2001) ....................................................... 16, 19

*American Alloys, Inc. v. United States*,
   30 F. 3d 1469 (Fed. Cir. 1994) ............................................................................. 10, 14

*ArcelorMittal USA LLC v. United States*,
   302 F. Supp. 3d 1366 (Ct. Int'l Trade 2018) .............................................................. 17

*Arnold P'ship v. Dudas*,
   362 F.3d 1338 (Fed Cir. 2004) .................................................................................... 9

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984) .................................................................................... 9

*Carlisle Tire & Rubber Co., Division of Carlisle Corp. v. United States*,
   622 F. Supp. 1071 (Ct. Int'l Trade 1985) .................................................................. 10

*Coalition for Preservation of Am. Brake Drum and Rotor Aftermarket Mfrs. v. United States*,
   44 F. Supp. 2d 229 (Ct. Int'l Trade 1999) .............................................................. 11, 13

*Colakoglu Metalurji A.S. v. United States*,
   394 F. Supp. 2d 1379 (Ct. Int'l Trade 2005) ............................................................. 21

*Consol. Bearings Co. v. United States*,
   358 F.3d 997 (Fed. Cir. 2003) ................................................................................... 25

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) ..................................................................................................... 8

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) ..................................................................................................... 9

*Corus Staal BV v. United States Steel Corporation*,
   502 F.3d 1370 (Fed. Cir. 2007) ............................................................................ 24, 25

*Ditar v. United States,*
   2025 WL 2795057 (Ct. Int'l Trade, Oct. 1, 2025) .................................................... 5

*Downhole Pipe & Equipment, L.P. v. United States*,
 776 F.3d 1369 (Fed. Cir. 2015) ........................................................................... 14

*FAG Kugelfischer Georg Schafer AF. v. United States*,
 131 F. Supp. 2d 104 (Ct. Int'l Trade 2001) ........................................................ 10

*Goodluck lndia Ltd. v. United States*,
 11 F.4th 1335 (Fed. Cir. 2021) ........................................................................... 10

*Husteel Co. v. United States*,
 98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ........................................................ 16

*Manchester Tank & Equip. Co. v. United States*,
 483 F. Supp. 3d 1309 (Ct. Int'l Trade 2020) ........................................................ 5

*Micron Tech, Inc. v. United States*,
 117 F. 3d 1386 (Fed. Cir. 1997) .......................................................................... 11

*Mittal Steel Point Lisas Ltd. v. United States*,
 548 F.3d 1375 (Fed. Cir. 2008) ........................................................................... 24

*New American Keg v. United States*,
 No. 20-0008, 2021 WL 1206153 (Ct. Int'l Trade March 23, 2021) ...................... 14

*Nippon Steel Corp. v. United States*,
 458 F.3d 1345 (Fed. Cir. 2006) ............................................................................. 9

*Nucor Corp. v. United States*,
 612 F. Supp. 2d 1264 (Ct. Int'l Trade 2019) .................................................. 20, 21

*Oman Fasteners, LLC v. United States*,
 125 F.4th 1068 (Fed. Cir. 2025)………………………………………………………9

*Phang Iron and Steel Co. v. United States*,
 1999 WL 970743 (Ct. Int'l Trade October 20, 1999) ......................................... 10

*PMC Specialties Group, Inc. v. United States*,
 1996 WL 497155 (Ct. Int'l Trade August 30, 1996) ........................................... 10

*Rhone Poulenc, Inc. v. United States*,
 899 F. 2d 1185 (Fed. Cir. 1990) .......................................................................... 24

*Star Fruits S.N.C. v. United States*,
 393 F.3d 1277 (Fed. Cir. 2005) ............................................................................. 9

*Tosçelik Profil ve sac Endüstrisi A.Ş., v. United States*
 256 F. Supp. 3d 1260 (Ct. Int'l Trade 2017) ...................................................... 17

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009)................................................................................................. 8

*United States v. L.A. Tucker Truck Lines, Inc.*,
  344 U.S. 33 (1952).................................................................................................. 24

*United States*,
  11 F.4th 1335 (Fed. Cir. 2021) ............................................................................

*United States*,
  498 F. Supp. 2d 1337 (Ct. Int'l Trade 2008) ....................................................

*Wheatland Tube Co. v. United States*,
  161 F.3d 1365 (Fed. Cir. 1998) ............................................................................. 9

**Statutes**

19 U.S.C. § 1516a(b) ................................................................................................ 8

19 U.S.C. § 1677(a) ............................................................................................. 22, 23

19 U.S.C. § 1677a(a)................................................................................................. 22

19 U.S.C § 1677a(b) ................................................................................................. 22

19 U.S.C § 1677e(a).................................................................................................. 15

19 U.S.C § 1677e(b) ................................................................................................. 15

19 U.S.C § 1677m(d)................................................................................................ 15

28 U.S.C. § 2637(d) ................................................................................................. 24

**Regulations**

19 C.F.R. § 351.401 ................................................................................................. 21

19 C.F.R. § 351.401(i)......................................................................................... 16, 19

**Other Authorities**

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*,
75 Fed. Reg. 59,217 (Dep't of Commerce Sept. 27, 2010) ........................................................ 10

*Certain Polyester Staple Fiber from the Republic of Korea: Preliminary Results of the 2007/2008 Antidumping Duty Administrative Review,*
74 Fed. Reg. 27,281 (Dep't of Commerce June 9, 2009), unchanged in *Certain Polyester Staple Fiber from the Republic of Korea: Final Results of the 2007-2008 Antidumping Duty Administrative Review,*
74 Fed. Reg. 65,517 (Dep't of Commerce Dec. 10, 2009) ........................................................ 17

*Certain Polyester Staple Fiber from the Republic of Korea: Final Results of the 2007-2008 Antidumping Duty Administrative Review,*
74 Fed. Reg. 65,517 (Dep't of Commerce Dec. 10, 2009) ........................................................ 17

*Emulsion Styrene-Butadiene Rubber from Mexico*,
64 Fed. Reg. 14,872 (Dep't of Commerce March 29, 1999) ................................................. 17, 18

*Ferrosilicon From Malaysia: Amended Final Determination of Sales at Less than Fair Value,*
90 Fed. Reg. 21,456 (Dep't of Commerce May 20, 2025) ........................................................ 2, 7

*Ferrosilicon From Malaysia: Amended Preliminary Determination of Sales at Less Than Fair Value and Amended Preliminary Negative Determination of Critical Circumstances*,
89 Fed. Reg. 99,829 (Dept. of Commerce Dec. 11, 2024) ........................................................ 4

*Ferrosilicon From Malaysia: Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Negative Determination of Critical Circumstances*,
90 Fed. Reg. 14,105 (Dep't of Commerce Mar. 28, 2025), as amended by *Ferrosilicon From Malaysia: Amended Final Determination of Sales at Less than Fair Value,* 90 Fed. Reg. 21,456 (Dep't of Commerce May 20, 2025).............................................................. 2

*Ferrosilicon From Malaysia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures,*
89 Fed. Reg. 88,010 (Dept. of Commerce Nov. 6, 2024) ........................................................ 4

*Fine Denier Polyester Staple Fiber from the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value,*
83 Fed. Reg. 24,743 (Dep't of Commerce May 30, 2018) .................................................11, 13

*Notice of Final Determination of Sales at Less Than Fair Value: Certain Large Diameter Carbon and Alloy Seamless Standard, Line and Pressure Pipe From Mexico,*
65 Fed. Reg. 39,358 (Dep't of Commerce June 26, 2000) ........................................................ 17

*Solid Urea from the Russian Federation: Final Results of Antidumping Duty Administrative Review*,
   75 Fed. Reg. 51,440 (Dep't of Commerce Aug. 20, 2010) ........................................................ 18

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE**

| | | |
|---|---|---|
| CC METALS AND ALLOYS, LLC, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| FERROGLOBE USA, INC., | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Consol. Court No. 25-00131 |
| | ) | **PUBLIC VERSION** |
| UNITED STATES, | ) | (redactions at pages 3, 4, 6, 12, 13 |
| | ) | 18, 19, 20) |
| *Defendant*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| OM MATERIAL (SARAWAK) SDN. | ) | |
| BHD. | ) | |
| | ) | |
| *Defendant-Intervenor*. | ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS'
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Defendant, the United States, respectfully submits this response in opposition to the

motion for judgment upon the agency record filed by plaintiffs, CC Metals and Alloys, LLC and

Ferroglobe USA, Inc., challenging the Department of Commerce's (Commerce) final

determination in the less-than-fair-value (LTFV) investigation on ferrosilicon from Malaysia.

Plaintiffs challenge two aspects of Commerce's determination—Commerce's acceptance during

verification of what it deemed to be a minor correction, and Commerce's date of sale analysis.

As demonstrated below, Commerce's final determination is supported by substantial evidence

and is otherwise in accordance with law. Accordingly, we respectfully request that the Court

1

sustain Commerce's final determination, deny plaintiffs' motion, and enter judgment in favor of the United States.

**STATEMENT PURSUANT TO RULE 56.2**

**I.    Administrative Determination Under Review**

The administrative determination under review is the final determination in LTFV investigation on ferrosilicon from Malaysia.  *See Ferrosilicon From Malaysia: Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Negative Determination of Critical Circumstances*, 90 Fed. Reg. 14,105 (Dep't of Commerce Mar. 28, 2025) (P.R. 255), as amended by *Ferrosilicon From Malaysia: Amended Final Determination of Sales at Less than Fair Value,* 90 Fed. Reg. 21,456 (Dep't of Commerce May 20, 2025) (P.R. 277) (collectively, final determination), and the accompanying Issues and Decision Memorandum  (IDM) dated March, 21, 2025 (P.R. 241).  The period of investigation is January 1, 2023, through December 31, 2023.

**II.    Issues Presented for Review**

1.    Whether Commerce's decision to accept what it deemed a minor correction presented by respondent at verification was an abuse of discretion or otherwise unlawful.

2.    Whether Commerce's date of sale analysis and subsequent treatment of that same respondent's U.S. "onward sales" as constructed export price transactions is supported by substantial evidence and otherwise lawful.

**STATEMENT OF FACTS**

In April 2024, Commerce initiated an investigation to determine whether ferrosilicon from Malaysia was being sold at less than fair value in the United States.  Commerce ultimately selected OM Material Sarawak SDN BHD (OMSA) and Pertama Ferroalloys SDN BHD

2

(Pertama) as mandatory respondents and issued its initial questionnaires to OMSA and Pertama. P.R. 34; C.R. 14.[1]

OMSA submitted timely responses to sections A, B, C, and D of Commerce's initial questionnaire, answering questions about comparison market sales, U.S. sales, and cost of production (COP)/constructed value (CV). *See* OMSA Section A Response (P.R. 55-68; C.R. 16-59); OMSA Section B-C Response (P.R. 91; C.R. 67); OMSA Section D Response (P.R. 97; C.R. 74). In their Section A response OMSA explained that it made two different types of sales: **[ ]** and **[** **]** sales. OMSA Sec A QR at 14 (P.R. 55; C.R. 16). OMSA further explained that for all [



] OMSA reported only export price sales. *See* OMSA U.S. Sales (C.R. 357).

Commerce issued supplemental questionnaires, to which OMSA timely responded. *See* Letter from Department of Commerce to OMSA First Supplemental Questionnaire (P.R. 118; C.R. 128); Supplemental Section D Questionnaire (P.R. 119; C.R. 129); *See also* OMSA Supplemental Section A-C Response (P.R. 129; C.R. 143-149); OMSA Supplemental Section D Response (P.R. 133; C.R. 154-164). In their supplemental questionnaire response, OMSA stated that for sales made on a **[ ]** basis, in other words **[** **]**, the final invoice **[**

---

[1] Citations to the public record (P.R.) and confidential record (C.R.) refer to the record of the underlying investigation.

3

**]**.  OMSA Supplemental Sec A QR at 13.  For sales made on a **[   ]** basis (**[                    ]**), OMSA confirmed that the sales were based on a price index and stated that the "**[**

**]**"[2] *Id.* at 13-14; *see also* SVE-5 at 2 (verifying a **[                ]** priced according to formula; *but see* SVE-5 at 3-6 (verifying a **[             ]** sale where the final price is contingent on an onward sale in the United States).  OMSA reported all of its sales as export price sales.

1.      In October 2024, Commerce issued its preliminary determination determining that for both types of sales, Commerce would apply its usual practice, calculating the date of sale as the earlier of the shipment date or invoice date.  *Ferrosilicon From Malaysia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures,* 89 Fed. Reg. 88,010 (Dept. of Commerce Nov. 6, 2024) (P.R. 149) and accompanying Preliminary Decision Memorandum (PDM) (P.R. 149).  On this record, this meant that Commerce found the date of sale to be the shipment date, which was the earlier.  *Id.*

In December 2024, Commerce amended the preliminary determination to correct ministerial errors with respect to the calculation of the preliminary weighted-average dumping margins for the mandatory respondents.  *See Ferrosilicon From Malaysia: Amended Preliminary Determination of Sales at Less Than Fair Value and Amended Preliminary Negative Determination of Critical Circumstances*, 89 Fed. Reg. 99,829 (Dept. of Commerce Dec. 11, 2024) (P.R. 186).

---

[2]   Here, the **[            ]** refers to the Commodities Research Unit (CRU), a well- known price index for the product.

2.      From November 2024 to January 2025, Commerce conducted cost and sales

verifications of OMSA.  *See* OMSA Cost Verification Report (P.R. 224; C.R. 374); OMSA Sales

Verification Report (P.R. 222; C.R. 361).  Commerce's verification agendas stated that new

information would be accepted at verification when: the need for that information was not

evident previously; the information made minor corrections to information already on the record;

or the information corroborated, supported, or clarified information already on the record.  *See*

OMSA Cost Verification Agenda at 2 (C.R. 233)*; see also* OMSA Sales Verification Agenda at 2

(C.R. 314).

During verification, Commerce accepted corrections from OMSA.  *See* OMSA Cost

Verification Report (P.R. 224; C.R. 374); *see also* OMSA Sales Verification Report (P.R. 222;

C.R. 359).  Specifically, Commerce accepted OMSA's corrections to its CONNUM coding.  *Id.*

A CONNUM is a control number established to reflect the goods' most significant physical

characteristics[3].  *See Ditar, S.A. v. United States*, 2025 WL 2795057 *7 (Ct. Int'l Trade, Oct. 1,

2025).

OMSA explained to Commerce that for calcium, carbon, titanium, sulfur, phosphorous,

and manganese content, OMSA had initially used the tolerances allowed under its sales contracts

to construct the CONNUM code for each of these chemical characteristics.  However, when

preparing for the cost verification, OMSA reviewed its production records and the chemical

characteristics identified in its test reports and determined that it had used the incorrect code

---

[3]  S*ee also Manchester Tank & Equip. Co. v. United States*, 483 F. Supp. 3d 1309, 1312
n.3 (Ct. Int'l Trade 2020) ("In order to ensure an apples-to-apples comparison of sales in the U.S.
and home markets, Commerce establishes a set of product criteria, from most to least important,
to identify identical and similar products. Within each of these criteria, the distinct characteristics
are given different numeric values which, when listed next to each other, constitute the 'control
number' or 'CONNUM' for that 'model' or 'type.'").

some of these metal contents. OMSA revised the CONNUM codes to correspond to its test reports. *See* OMSA Cost Verification Report (P.R. 224; C.R. 374); *see also* OMSA Sales Verification Report (P.R. 222; C.R. 361).

Commerce reviewed the sales contracts for all sales and confirmed that the CONNUM assignments were now based on test reports. *Id.* Commerce also determined that the changes "{did} not have any impact on costs," then relied on that determination for the sales side as well. *Id*. Based on its assessment, Commerce determined that OMSA's corrections were minor in nature and accepted them at both the costs and sales verifications. *Id.* Commerce also verified OMSA's sales practices. *See also* SVE-5 at 2 (verifying a **[** **]** priced according to formula); *see also* SVE-5 at 3-6 (verifying a **[** **]** sale where the final price is contingent on an onward sale in the United States); *see also* OMSA Supplemental Sec A QR at 16-17 (explaining that though the **[**

**]**).

Both petitioners and OMSA submitted case and rebuttal briefs. *See* Petitioner's Case Brief (P.R. 230; C.R. 377); OMSA's Case Brief (P.R. 229; C.R. 376); Petitioner's Rebuttal Brief (P.R. 232; C.R. 379); OMSA Rebuttal Brief (P.R. 231; C.R. 378). In their briefs, petitioners challenged OMSA's CONNUM reporting and requested that Commerce apply total facts available with an adverse inference, or in the alternative partial facts available with an adverse inference, or facts available. For their part, OMSA requested Commerce change the date of sale to final invoice date.

3.      In its final determination, Commerce continued to accept the revised CONNUMs presented at verification. Specifically, Commerce concluded that the CONNUM revisions "resulted in a one-to-one replacement of the CONNUMs," and, with the exception of one sale

affected by a different correction, "the sales reporting was not affected, e.g., all sales originally reported as CONNUM A remain reported for revised CONNUM A." IDM at 8-9. Nor did the reporting "have a significant impact or call into question the overall integrity of OMSA's reported data." *Id.* at 9. "Considering that no new CONNUMS were created, there was no shifting of CONNUMs, and the change in CONNUM coding reflected the physical characteristics more accurately, we accepted the changes are minor corrections." *Id.*

Commerce also changed the date of sale for OMSA's so-called onward sales[4] to the date of final invoice. For these sales, Commerce determined that the final invoice was the "appropriate date of sale" because "the sales terms remain open to negotiation and the parties have discretion to set prices until the onward sale is finalized." *Id.* at 17. Commerce categorized these sales as CEP sales because the final price was calculated based on the sale which occurred between the trader and the final customer in the United States (*i.e.* after importation). *Id.*

The next month, Commerce corrected certain ministerial errors which resulted in changes to the final cash deposit rate for the mandatory respondents and the all others' rate. Following an affirmative finding by the International Trade Commission, Commerce published the antidumping duty order covering ferrosilicon from Malaysia. *See Ferrosilicon From Kazakhstan: Amended Final Determination of Sales at Less than Fair Value,* 90 Fed. Reg. 21,456 (Dep't of Commerce May 20, 2025) (P.R. 277).

### SUMMARY OF ARGUMENT

 Commerce's decision to accept OMSA's CONNUM revisions at verification was well within its discretion. Commerce notified parties that it would accept minor corrections at

---

 [4] To avoid the reliance on proprietary information, we refer to these sales as "onward," which conveys that they calculated based on the sale made by an intermediary trader.

7

verification.  Minor corrections are those that, among other things, are verifiable, and do not substantially revise previously reported data.  Here, Commerce was able to verify the revised CONNUMs and found that the revisions did not affect the sales reporting.  Ignoring those critical facts, plaintiffs rely mainly on the optics of the revision, and not on the substance of the revision—and the substance reflected a one-to-one replacement of the CONNUMs in which all sales originally reported as under a particular CONNUM remained reported for the revised CONNUM.

Commerce also correctly determined that the date of sale for OMSA's onward sales was the date of final invoice.  The record demonstrated that the sales terms for these onward sales were not set until the final invoice date.  This makes sense given that the final sale was based on the sale between a trader and the end customer—in the United States.  Commerce's categorization of OMSA's onward sales as CEP sales flowed directly from its date of sale analysis.  Because CEP sales are ones that occur after importation, Commerce was in fact required to treat OMSA's onward sales as CEP sales, regardless of whether that narrowed the sales in the period of review.  Finally, the Court should not remand for OMSA to provide a new sales database.  Plaintiffs declined to raise this request with Commerce during the investigation and therefore have not exhausted it.

**ARGUMENT**

I.    **Standard of Review**

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence, or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to

8

support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions does not make Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Thus, a party challenging an agency determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (internal citation and quotation omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984). Moreover, it is not necessary for Commerce to provide an explicit explanation so long as its decisional path is reasonably discernible. *See Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369-70 (Fed. Cir. 1998).

The Federal Circuit has held that the Administrative Procedure Act supplies the standard for whether Commerce has abused its discretion. *See Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1084 (Fed. Cir. 2025). An abuse of discretion occurs when the agency's exercise rests on a "clear error of judgment in the consideration of the relevant factors" *Id.* (citation omitted).

## II. Commerce's Acceptance of OMSA's Corrected CONNUMs Was Not an Abuse of Discretion or Unlawful

1. Commerce determined that certain corrections submitted by OMSA prior to verification were minor in nature. *See* OMSA Sales Verification Report at 2-3 (C.R. 361); *see also* OMSA Cost Verification Report at 2-3 (C.R. 374). That decision was fully within Commerce's authority and was not an abuse of discretion. *See* IDM at 7-11.

9

Commerce generally considers several factors when determining whether to accept minor corrections. These include:

> whether the correction is clerical or methodological, whether {Commerce is} able to verify the error and are satisfied with the documentary support for the reported correction, whether the error calls into question the overall integrity of the respondent's submissions, and whether it amounts to a substantial revision of previously reported data.

*See Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 75 Fed. Reg. 59,217 (Dep't of Commerce Sept. 27, 2010), and accompanying IDM at Comment 10 (internal citations omitted). Typically, corrections accepted at verification include corrections of minor mistakes in addition, subtraction, or other arithmetic function, minor data entry mistakes, clerical errors resulting from inaccurate copying, duplication, and minor classification errors. *See* IDM at 8; *see also Certain Coated Paper* at Comment 10.

The Federal Circuit has held that Commerce's practice in accepting a minor correction at verification "strikes an appropriate balance between finality and accuracy{,}" and "it is within Commerce's discretion to decide which interest outweighs the other on a case-by-case basis." *Goodluck lndia Ltd. v. United States,* 11 F.4th 1335, 1343 (Fed. Cir. 2021). Commerce has broad discretion to set its own verification procedures and to decide what information to accept at verification. *See FAG Kugelfischer Georg Schafer AF. v. United States,* 131 F. Supp. 2d 104, 106 (Ct. Int'l Trade 2001) (quoting *PMC Specialties Group, Inc. v. United States,* 1996 WL 497155 (Ct. Int'l Trade August 30, 1996); and *Phang Iron and Steel Co. v. United States,* 1999 WL 970743 (Ct. Int'l Trade October 20, 1999) ("'{Commerce} has considerable latitude in picking and choosing which items it will examine in detail.' In fact, 'Commerce enjoys wide latitude in its verification procedures.' The Court defers to the agency's sensibility as to the depth of

10

inquiry needed."); *Carlisle Tire & Rubber Co., Division of Carlisle Corp. v. United States*, 622 F. Supp. 1071, 1082 (Ct. Int'l Trade 1985); *American Alloys, Inc. v. United States*, 30 F.3d 1469, 1475 (Fed. Cir. 1994) ("{T}he statute{s} give Commerce wide latitude in its verification procedures."); and *Micron Tech, Inc. v. United State*s, 117 F. 3d 1386, 1396 (Fed. Cir. 1997) ("Congress has implicitly delegated to Commerce the latitude to derive verification procedures ad hoc.")).

The mere fact that a large number of transactions are affected by a correction does not mean that correction is significant or warrants the application of facts available with an adverse inference. *See Fine Denier Polyester Staple Fiber from the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value,* 83 Fed. Reg. 24,743 (Dep't of Commerce May 30, 2018), and accompanying IDM at Comment 1a.  Indeed, this Court has previously held that it is the nature of the error and its effect on the validity of the submission that matters, not the value of those errors as a percentage of total sales, or number of instances of errors.  *See Coalition for Preservation of Am. Brake Drum and Rotor Aftermarket Mfrs. v. United States*, 44 F. Supp. 2d 229, 236 (Ct. Int'l Trade 1999).

2.	Commerce's decision here was fully within this broad discretion and was consistent with Commerce's practice.  As a threshold matter, Commerce put parties on notice that it would accept minor corrections, advising in its verification agendas that new information would be accepted when: the need for that information was not evident previously; the information makes minor corrections to information already on the record; or the information corroborates, supports, or clarifies information already on the record.  *See* OMSA Cost Verification Agenda at 2 (C.R. 233); *see also* OMSA Sales Verification Agenda at 2 (C.R. 314).

11

At verification, OMSA reported corrections for some coding for constructing certain CONNUMs, specifically for the codes used for titanium, manganese, carbon, and phosphorous. *See* OMSA's Sales Verification Report at 2 (C.R. 361).  OMSA had "**[**

**]**" to create the code for each chemical characteristics, but when preparing for cost and sales verification, OMSA realized it "**[**

**]**" *See* OMSA Sales Verification Exhibit 1. Therefore, for each of the **[      ]** CONNUMs they had previously reported, OMSA revised the codes to accurately "reflect the physical characteristics in accordance with OMSA's test reports instead of using the broader, and sometimes silent, allowances for these elements under the sales contract." OMSA's Rebuttal Brief at 4 (C.R. 378).  Commerce was able to verify the information OMSA relied on for CONNUM revisions and confirmed there was no impact on the reported costs.  *See* IDM at 8; *see also* OMSA's Cost Verification Report at 3; OMSA's Sales Verification Report at 2-3.

In the final determination, Commerce agreed with OMSA that the CONNUM coding revision resulted in a one-to-one replacement of the CONNUMs and the sales reporting was not affected.  *See* IDM at 8-9.  As a practical matter, this meant that all sales originally reported as CONNUM A remain reported for revised CONNUM A."  IDM 8-9.  "Considering that no new CONNUMS were created, there was no shifting of CONNUMs, and the change in CONNUM coding reflected the physical characteristics more accurately," Commerce's decision to accept the changes as minor corrections was not only supported by the record, it resulted in a more accurate set of CONNUMs.  CONNUMs are used to match a home market sale with an identical or nearly identical U.S. sale.  Plaintiffs contend that the revised codes, in one instance, resulted in fewer matches with the home market.  Pls. Br. at 23. This in and of itself does not suggest any error

with the revisions.  In fact, as Commerce determined, the revisions more accurately represented the content of the product, meaning that the percentage of home market matches should have now been more accurate.  *See* IDM at 9.

Plaintiffs mainly complain that OMSA's revisions impacted **[    ]** percent of its CONNUMs, and resulted in a lower dumping margin, but cites no case law suggesting these results alone are troubling.  Pls. Br. at 22-24.  In fact, Commerce found the opposite here, explaining that the mere fact that a large number of transactions are affected by a correction *does not mean* that the correction is significant or warrants the application of facts available with an adverse inference.  *See* IDM at 8.  This is consistent with Commerce's prior practice.  *See also Fine Denier Polyester Staple Fiber from the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value,* 83 Fed. Reg. 24,743 (Dep't of Commerce May 30, 2018), and accompanying IDM at Comment 1a.  This is also consistent with this Court's precedent, holding that it is the *nature* of the error and the effect on the validity of the submission that matters, not the value of those errors as a percentage of total sales, or the number of instances of errors.  *See Coalition for Am. Brake Drum & Rotor*, 44 F. Supp. 2d at 236 (citations omitted).

In line with this standard, Commerce "evaluated the nature of the error and whether we were able to verify the error and were satisfied with the documentary support for {OMSA's} submissions."  IDM at 8.  With only one exception, "the sales reporting was not affected," which meant that "all sales originally reported as CONNUM A remain reported for revised CONNUM A."  Because the margin is based on a comparison between normal value and export price (or constructed export price), the cost and sales information are the critical information to determine whether a respondent is selling subject merchandise for less than fair value.  *See AG der Dillinger Hüttenwerke v. United States*, 156 F.4th 1314, 1325 (Fed. Cir. 2025) ("the statutory

13

scheme seeks to compare cost of production to selling price"); *Pro-Team Coil Nail Enterprise, Inc. v. United States*, 483 F. Supp. 3d 1242, 1249 (Ct. Int'l Trade 2020) ("{R}eliable and complete cost information is necessary for Commerce to 'calculate constructed value, . . . establish a basis for comparison to U.S. price,' and, ultimately, calculate an accurate dumping margin."); *see also* 19 U.S.C. § 1677b(a).   If all the sales reported remain the same, the revised CONNUMs are, for purposes of Commerce's exercise, minor changes.

Notwithstanding Commerce's explanation above, plaintiffs complain that Commerce did not verify OMSA's minor corrections.  Pls. Br. at 26.  But Commerce *did* verify the revised CONNUMs.  *See* Cost Verification Report at 3; *See also* Cost Verification Exhibit 7 (C.R. 267-68).  Specifically, Commerce "reviewed the sales contract for all sales" and "confirmed that the CONNUM assignments are now based on the test reports."  *Id.*  Ignoring this explanation, plaintiffs point to Commerce's verification of sales traces using the former CONNUMs to show that Commerce did not verify the revised CONNUMs in the same way.  *Id.*  But Commerce was not required to verify the revised CONNUMs in the same way.  Commerce has wide latitude in crafting its verification procedures.  *See American Alloys*, 30 F. 3d at 1475

Even under plaintiffs' view of this Court's decision in *New American Keg v. United States*, No. 20-0008, 2021 WL 1206153 (Ct. Int'l Trade March 23, 2021), Commerce would only be required to verify whether information presented for the first time at verification is correct. *See New American Keg* at *16.  Commerce did just that.  IDM at 8-9.  Commerce verified that the information underlying the revised CONNUMs was correct and that all sales remain reported for specific CONNUMs.  *See* IDM at 8.  In any event, the reasoning behind the holding of *New American Keg* rested on the result of the corrections identified at verification: the margin going from positive to *de minimis*.  No similar concerns exist here, because a non-*de minimis* margin

14

would have been found regardless of whether Commerce had accepted the correction. Ultimately, plaintiffs are asking the Court to reweigh the record evidence and substitute its opinion for a question squarely within Commerce's wide discretion. *See Downhole Pipe & Equipment, L.P. v. United States*, 776 F.3d 1369, 1376-77 (Fed. Cir. 2015) ("While Appellants invite this court to reweigh this evidence, this court may not do so."). The Court should decline to do this.

3.    Not only do plaintiffs want to constrain Commerce's discretion during verification, they also want to force Commerce to exercise its discretion to apply facts available with an adverse inference. Pls. Br. at 29. Even if the Court determines Commerce's decision to accept OMSA's revisions was not supported by the record, the Court should still decline to force Commerce to apply an adverse inference.

Commerce follows a two-step process to determine whether to fill gaps in the record with facts otherwise available and, if so, whether to use an adverse inference when selecting among those facts. 19 U.S.C § 1677e(a)-(b). First, Commerce considers whether (1) necessary information is not available, *or* (2) an interested party (A) withholds information requested by Commerce, (B) fails to provide the information in the form or in the manner requested, (C) significantly impedes the proceeding, or (D) provides information that cannot be verified. *Id.* at § 1677e(a). If *any* of these criteria are met, Commerce "shall, subject to section 1677m(d) of this title {*i.e.*, notice and opportunity to cure}, use the facts otherwise available in reaching the applicable determination." *Id.* at § 1677e(a) (emphasis added). Second, Commerce considers whether a respondent "has failed to cooperate by not acting to the *best of its ability* to comply with a request for information." *Id.* at § 1677e(b)(1) (emphasis added). If Commerce concludes this is the case, then Commerce may apply an adverse inference in selecting among the facts

otherwise available.  *Id.*  Plaintiffs cite to the facts available portion of the statute, but they provide limited analysis as to which factor applies here outside of stating "Commerce should have rejected the new information."  Pls. Br. at 29.   Therefore, we focus our discussion on their request for adverse inferences.

First, OMSA did not withhold information.  It presented revised information that it discovered in preparing for verification.  *See* OMSA Sales Verification Report at 2.  Second, OMSA did not fail to provide this information—rather it corrected timely information at an opportunity permitted by Commerce's verification agenda.  *Id; see also* OMSA Sales Verification Agenda.  Third, OMSA did not impede the proceeding or provide information that could not be verified.  Instead, it provided information that Commerce was able to verify and include in its calculations—information that Commerce determined changed no sales data.  Commerce had the discretion to accept the changes, and so there is no gap in the record.  Even if the Court determines that OMSA's revisions were not properly raised during verification, it would be highly unusual for the Court to then force Commerce to find the situation warranted application of an adverse inference.  After all, "Commerce is not *required* to apply an adverse inference, even if a party has not acted to the best of its ability."  *Husteel Co. v. United States*, 98 F. Supp. 3d 1315, 1356 (Ct. Int'l Trade 2015) (emphasis added); *see also Zhejiang Dunan Hetian Metal Co., Ltd. v. United States*, 652 F.3d 1333, 1346 (Fed. Cir. 2011) ("Commerce must first determine that it is proper to use facts otherwise available before it may apply an adverse inference").

## III.    Commerce's Treatment of OMSA's U.S. Onward Sales Is Supported by Substantial Evidence and Otherwise in Accordance with Law

Commerce correctly determined that the date of sale for OMSA's "onward sales" was the final invoice date, which occurred after importation to the United States.  IDM at 16-17.

16

Because sales that occur after importation are, by definition, CEP sales, Commerce also correctly determined the sales should be recategorized as CEP transactions. IDM at 16-17.

1.      Commerce will normally use the date of invoice to identify the date of sale of subject merchandise unless Commerce is satisfied that "a different date better reflects the date on which the exporter or producer establishes the material terms of sale." 19 C.F.R. § 351.401(i). A date other than invoice date will better reflect when material terms of sale are established if the party can show that the material terms of sale undergo no further change between the proposed date and the invoice date. *See Allied Tube and Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1090 (Ct. Int'l Trade 2001) (citing *Notice of Final Determination of Sales at Less Than Fair Value: Certain Large Diameter Carbon and Alloy Seamless Standard, Line and Pressure Pipe From Mexico,* 65 Fed. Reg. 39,358 (Dep't of Commerce June 26, 2000), and IDM at Comment 2). An interested party proposing a different date of sale must demonstrate that the material terms of sale were "firmly" and "finally" established on its proposed date. *See ArcelorMittal USA LLC v. United States,* 302 F. Supp. 3d 1366, 1375-76 (Ct. Int'l Trade 2018) (internal citations omitted). This burden requires that the party wishing to show a date other invoice date should be used as the date of sale must do more than "only create some doubt about when material terms are set." *See Tosçelik Profil ve sac Endüstrisi A.Ş., v. United States* 256 F. Supp. 3d 1260, 1263 (Ct. Int'l Trade 2017).

When the shipment date precedes the invoice date, Commerce generally finds that the shipment date better reflects the date on which material terms of sale are established. *See* PDM at 8; *see also Certain Polyester Staple Fiber from the Republic of Korea: Preliminary Results of the 2007/2008 Antidumping Duty Administrative Review,* 74 Fed. Reg. 27,281, 27,283 (Dep't of Commerce June 9, 2009), unchanged in *Certain Polyester Staple Fiber from the Republic of*

17

*Korea: Final Results of the 2007-2008 Antidumping Duty Administrative Review,* 74 Fed. Reg. 65,517 (Dep't of Commerce Dec. 10, 2009).  Further, where price adjustments are made pursuant to specific formulas or indices, Commerce has found the price adjustments do not change the date of sale.  *See Notice of Final Determination of Sales at Less Than Fair Value: See also, Emulsion Styrene-Butadiene Rubber from Mexico*, 64 Fed. Reg. 14,872, 14,879 (Dep't of Commerce March 29, 1999), and accompanying IDM at Comment 3.

2.        Here, OMSA made two types of sales.[5]  For OMSA's sales between the respondent and the U.S. customer, the price was fixed to an index.  IDM at 16.  For these sales, there was "nothing more for the parties to negotiate{,}" so Commerce treated the shipment date as the date of sale, consistent with its general practice.  *Id.*; *see also id.* (quoting *Solid Urea from the Russian Federation: Final Results of Antidumping Duty Administrative Review*, 75 Fed. Reg. 51,440 (Dep't of Commerce Aug. 20, 2010), and accompanying IDM at Comment 3).  This is consistent with OMSA's questionnaire response that the final price "may change as a result of the price quote period."  OMSA Supplemental Sec A QR at 13 (C.R. 143).  The index is tied to a stated period.  If the period changes, the price can change.  But there is no evidence that the period for these sales changed.

But for OMSA's onward sales, Commerce determined that the invoice date more accurately reflected the date the final terms were set.  OMSA's onward sales were different than

---

[5]   Despite OMSA clearly using only two types of sales, and Commerce delineating between two types of sales, plaintffs claims that "OMSA exported subject merchandise using three types of U.S. sales during the POI."  Pls. Br. at 35.  There appears to be no record evidence to support this contention or plaintiffs' contention that some **[                                        ]**.  *See also* SVE-5 at 2 (verifying a **[                                        ]** priced according to formula; *but see* SVE-5 at 3-6 (verifying a **[                    ]** sale where the final price is contingent on an onward sale in the United States); *see also* OMSA Supplemental AQR at 16-17 (C.R. 143).

18

its other sales between the respondent and the unaffiliated U.S. customer.  The onward sales **[**

**]** and were then sold from the trader to the end customer in the United States.  IDM at 17; *see*

*also* OMSA Sales Verification Report at 6-7; SVE-5 C.R. 228.  Because material terms, such as

price, were still up for negotiation after the shipment date, it would have been improper for

Commerce to consider shipment date the date of sale. *See* 19 C.F.R. § 351.401(i).

Plaintiffs contend that the record demonstrates "OMSA used the same procedures and

paperwork in all of its {onward} U.S. sales, whether those sales involved prices tied to the CRU

index or prices determined in discussions between the unaffiliated traders and ultimate U.S.

customers."  Pls. Br. at 35.  But plaintiffs cite no record evidence showing onward sales were tied

to the CRU index.  Nor did OMSA treat all of its sales "essentially the same."  Pl. Br. at 35.

OMSA clearly stated that it uses a **[**

**]**. OMSA Sec AQR (C.R. 16) at 21-22.

These factual inaccuracies aside, plaintiffs also mistake the relevant analysis.  The

relevant question for selecting date of sale here is whether material terms are not subject to

meaningful change.  *See Allied Tube*, 132 F. Supp. 2d 1087 at 1090.  Here, for onward sales, the

price was still open to negotiation and could change at any time prior to the final invoice date.

*See* OMSA Sales Verification Exhibit 5 at 3-6 (C.R. 328); *See also* OMSA's Supplemental

Section A QR at 16-17.

Plaintiffs contend that even within the universe of OMSA's onward sales, Commerce

determined the date of sale for some as the shipment date, and for others the invoice date.  Pls.

Br. at 37.  The record does not support this, and in fact supports the opposite.  In Commerce's

margin calculations, onward sales were denoted in the OMSA's U.S. Sales data with a **[**

**]** demonstrating that these sales were on a **[**                                        **]** basis.

OMSA's U.S. Sales Data (C.R. 357).  In calculating this margin, Commerce treated *all* of these **[**

**]** sales as CEP sales.  *See* Margin Program at Line 970 (C.R. 414) *("* **[**

**]**).  There is no indication that Commerce determined the date of sale within this

category to be anything other than the final invoice date.

Plaintiffs further contend that Commerce failed to consider the parties' course of conduct

and expectations, as required by this Court's decision in *Nucor Corp. v. United States,* 612 F.

Supp. 2d 1264, 1308 (Ct. Int'l Trade 2019).  But Commerce made its determination based on

OMSA's own contracting behavior.  The record demonstrates that company officials specifically

explained that for **[                            ]** sales, the final price was calculated based on the CRU

index price in a stated time period.  OMSA Sales Verification Report at 6 (C.R. 361); *see also*

OMSA Sales Verification Exhibit 5 at 2 (C.R. 328).  However, for **[                 ]** sales, the final

price was calculated based on the onward sale in the United States.  *Id.* at 6-7; *see also* OMSA

Sales Verification Exhibit 5 (C.R. 328); *See also* OMSA U.S. Sales (C.R. 357).  There is no other

course of conduct suggesting Commerce should have found otherwise.

Plaintiffs invoke *Nucor* again, contending that Commerce did not consider the following

factors set forth by the Court:

> (1) the shift to the final invoice date for the onward sales in the investigation
> reflected the 'meeting of the minds of the material terms of sale' given the
> substantial evidence on the record; 2) that shift resulted in a calculation of
> OMSA's AD margin 'on a fair and equitable basis;' and 3) the ultimate result
> of the change to Commerce's calculations satisfied 'Commerce's overarching
> obligation to determine dumping margins as accurately as possible.

*See* Pls. Br. at 40 (citing *Nucor* and others).  As an initial manner, these "key factors" are a

simplified commingling of propositions from *Nucor* and other cases.  *Nucor* specifically states

only the first factor – a meeting of the minds on material terms of sale – as key to determining

whether the final invoice date should be used.  *See Nucor*, 612 F. Supp. 2d at 1308 (citing cases

20

that discuss the other factors).  In any event, plaintiffs fail to show that Commerce's determination does not meet each of these factors.

First, the final invoice date reflects the first meeting of the minds of the material terms of sale.  Plaintiffs contend that there is "no evidence on the record that OMSA was involved in any discussions … on price{.}"  Pls. Br. at 41.  Additionally, they state "there is no record evidence indicating the understanding or the expectations of the unaffiliated trading company or the ultimate customers for either the sales using CRU index prices or prices for merchandise pursuant to the onward sales{.}"  Pls. Br. 41.  However, the date of sale regulation, 19 C.F.R. § 351.401, establishes a "rebuttable presumption" for the agency to use final invoice date as date of sale.  *Nucor*, 612 F. Supp. 2d at 1307 (citing *Colakoglu Metalurji A.S. v. United States,* 394 F. Supp. 2d 1379, 1380-81 (Ct. Int'l Trade 2005)).  Shifting the burden onto Commerce to demonstrate why the final invoice date reflects the meeting of minds is inconsistent with this authority.

Plaintiffs also contend that "Commerce requested no information pertaining to the price discussions between the unaffiliated traders and ultimate customers," thus requiring parties to depend on OMSA's reporting to establish an understanding of the appropriate date of sale.  Pls. Br. 41.  Again, it is not Commerce's burden to prove that the material terms were set at the invoice date—that is the assumption under the regulation.  It is true that OMSA originally reported the date of sale for all of its sales as the shipment date and that Commerce accepted this categorization in the preliminary results.  But plaintiffs ignore OMSA's clarification of the nature of its sales, outlined in its case brief.  *See* Pls. Br. at 39.  This clarification is borne out by the record.  *See* OMSA's Case Brief at 4-5 (P.R. 229; C.R. 376).  The only "surprise" is that Commerce evaluated party arguments presented in their case briefs and made a determination not

21

in favor with plaintiffs' preference.  Pls. Br. at 42.  Plaintiffs had a full and fair opportunity to rebut the argument in their rebuttal brief.  *See* Petitioner Rebuttal Brief at 1, 2-3 (C.R. 379).

Finally, plaintiffs contend that changing the date of sale introduced inaccuracies into Commerce's calculations.  *See* Pls. Br. at 35.  Again, plaintiffs' main complaint seems to be Commerce's initial acceptance of OMSA's initial reporting.  Plaintiffs would have Commerce maintain the date of sale as the shipping date regardless of the record evidence to the contrary. Commerce did not introduce inaccuracies in the final determination; rather the final determination appropriately applied Commerce's standard practice after consideration of arguments following the preliminary determination.

3.     Relatedly, plaintiffs complain that Commerce should not have categorized OMSA's onward sales as CEP sales because the sales then fell outside the period of investigation.  When the date of sale is *after* the date of importation to the United States, the statute directs Commerce to categorize these sales as CEP sales.  *See* 19 U.S.C. § 1677a(b). Because Commerce designated the date of sale for onward sales as the final invoice date and the final invoice date of these sales was *after* the date of importation to the United States, Commerce acted consistent with the statute in categorizing these sales as CEP transactions.

Commerce is directed by statute when it should use EP and when it should use CEP.  19 U.S.C § 1677a(a) explains when sales should be categorized as export price transactions:

> Export Price.---The term "export" price means the price at which the subject merchandise is first sold (or agree to be sold) **before the date of importation** by the producer or exporter  of the subject merchandise outside of the United States to an unaffiliated purchaser in the United states or to an unaffiliated purchaser for exportation to the United States.

19 U.S.C. § 1677(a)(a) (emphasis added).  Section 1677a(b) explains when sales are categorized as constructed export price transactions:

22

Constructed Export Price.---The term "constructed export price" means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States **before or after the date of importation** by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d)

19 U.S.C. § 1677(a)(b) (emphasis added). Thus, applying the plain language of the statute, when the date of sale is *after* the date of importation, Commerce designates these sales as CEP transactions.

Here, the date of sale of each of OMSA's onward sales transactions was *after* each respective importation into the United States. IDM at 17. Therefore, the statute clearly directs Commerce to designate these onward sales as CEP transactions. *See* 19 U.S.C. § 1677(a)(b). Commerce had no discretion to do otherwise, contrary to plaintiffs' suggestion. Pls. Br. at 32.

Plaintiffs make the illogical point that Commerce's verification report found no discrepancies in OMSA's reporting even though OMSA's original submissions categorized onward sales as EP sales. Pls. Br. at 38-41. This is because Commerce eventually understood that the sales were not EP sales. Taken to its logical extension, plaintiffs' view would mean that Commerce could never accept any change in reporting, regardless of whether the record supported it—Commerce would be bound to plaintiffs' original description of its sales. Similarly, plaintiffs note that no one advocated for CEP treatment of OMSA's sales and that the recategorization resulted in a drastic change in the calculated margin. Pls. Br. at 42-43. Again, once Commerce understood that the date of sale was after import into the United States, 19 U.S.C. § 1677a(b) directed Commerce to determine these sales as CEP sales.. That this determination resulted in a lower margin is not material to Commerce's appropriate application of the statute. Commerce's role is not to provide petitioners with the highest margin; rather, Commerce's overarching role is to calculate the most accurate margin possible. *See Rhone Poulenc, Inc. v. United States*, 899 F. 2d 1185, 1191 (Fed. Cir. 1990).

23

4.    If the Court disagrees with plaintiffs on the categorization of OMSA's onward sales, plaintiffs alternatively request a remand for OMSA to update its U.S. sales database "to include all onward sales that shipped before the POI and for which prices were concluded between the unaffiliated trading company and ultimate customer during the POI."   Pls. Br. at 44.

Plaintiffs have failed to exhaust their administrative remedies with respect to this issue. Plaintiffs never argued that Commerce should request additional information from OMSA.  *See* Petitioners' Rebuttal Brief at 1-3.  This is despite fully briefing the issue of whether to treat final invoice date as date of sale.  Under 28 U.S.C. § 2637(d), Congress mandated that the Court of International Trade "{s}hall, where appropriate, require the exhaustion of administrative remedies" in civil actions arising from Commerce's antidumping duty determinations.  The statute reflects "a congressional intent that, absent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies." *Corus Staal BV v. United States Steel Corporation*, 502 F.3d 1370, 1379 (Fed. Cir. 2007).  Exhaustion is "a requirement explicitly imposed by the agency as a prerequisite for judicial review." *Id.* at 1379.  This Court "generally takes a strict view of the requirement that parties exhaust their administrative remedies before {Commerce} in trade cases." *Id.* at 1379.  Parties must raise issues with specificity and "at the time appropriate under {an agency's} practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 36-37 (1952).

Parties may only avoid the requirement to exhaust their administrative remedies if their argument raises a pure question of law or whether it would be futile to require exhaustion.  *Id.* at 1378, fn. 4; *see also Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1384-85 (Fed. Cir. 2008).  To fall under the futility exception, a party must show that they "would be required to go through obviously useless motions in order to preserve their rights." *Corus Staal*, 502 F.3d

24

at 1379 (internal quotation omitted).  The futility exception "is a narrow one{,}" and "{t}he mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust its administrative remedies."  *Id.*  To fall under the "pure question of law" exception, a party must show that the issue presents a pure legal issue that requires only an examination of the relevant statute, and does not require the application of any special expertise from the agency or the development of a factual record either before or after the Court's consideration of the issue.  *See Consol. Bearings Co. v. United States*, 358 F.3d 997, 1003 (Fed. Cir. 2003).

The request for OMSA to update its sales database is not a question of law at all, let alone a pure one.  The request, if granted, would require OMSA to add factual evidence to the record and would require Commerce to analyze that factual information.  Similarly, it would not be futile for plaintiffs to have raised this administratively.  Plaintiffs challenged the date of sale determination in their rebuttal brief, showing awareness that this was a decision under consideration for Commerce.  *See* Petitioner Rebuttal Brief at 1, 2-3 (C.R. 379).  Plaintiffs could have also requested this alternative relief from Commerce and chose not to.  Additionally, Commerce was required by statute to designate the onward sales as CEP sales, therefore plaintiffs should have been on notice that the designation was possible once the date of sale issue was raised.  Therefore, plaintiffs had the opportunity at the administrative level to raise the issue.  And in any event, plaintiffs have not demonstrated that the current record does not already include the full universe of sales.

## CONCLUSION

For these reasons, we respectfully request that the Court deny the plaintiffs' motion, sustain Commerce's final determination, and enter judgment for the United States.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/ Claudia Burke
CLAUDIA BURKE
OF COUNSEL:
SAMUEL E. CHILDERSON
Attorney
Department of Commerce
Office of Chief Counsel for Trade
Enforcement & Compliance
1401 Constitution Avenue, NW
Washington, D.C., 20230

Deputy Director
Commercial Litigation Branch
U.S. Department of Justice
Civil Division
P.O. Box 480
Ben Franklin Station
Washington, D.C., 20044
Email: Claudia.Burke@usdoj.gov

April 24, 2026

*Attorneys for Defendant*

26

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the Rules of this Court in that it contains 7772 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>s/ Claudia Burke</u>

CLAUDIA BURKE