## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE: THE HONORABLE JOSEPH A. LAROSKI, JR., JUDGE

| | |
|---|---|
| CC METALS AND ALLOYS, LLC AND FERROGLOBE USA, INC., <br><br>          Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br>          Defendant, <br><br> and <br><br> OM MATERIALS (SARAWAK) SDN. BHD. <br><br>          Defendant-Intervenors. | Court No. 25-00131 <br><br> **NON-CONFIDENTIAL VERSION** <br><br> **Business Proprietary Information Contained in Brackets ("[]") and Removed on Pages 8-13 and 17-20** |

## DEFENDANT-INTERVENORS' RESPONSE BRIEF IN OPPOSITION TO PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Christine M. Streatfeild
Nathaniel J. Halvorson

**Baker & McKenzie LLP**
815 Connecticut Avenue, N.W.
Washington, DC 20006-4078
Tel.: (202) 835-6111
christine.streatfeild@bakermckenzie.com

Date: May 8, 2026

*Counsel to OM Materials (Sarawak) Sdn. Bhd.*

**TABLE OF CONTENTS**

I.    RULE 56.2 STATEMENT ................................................................................... 1

    A.    Administrative Determination to Be Reviewed................................................ 1

II.   STATEMENT OF FACTS ................................................................................ 1

III.  STANDARD OF REVIEW .............................................................................. 5

IV.   ARGUMENT .................................................................................................... 6

    A.    Commerce's Acceptance of OMSA's Corrected CONNUM Reporting Was Not an Abuse of Discretion or Unlawful ...................................................... 6

        i.    Plaintiffs mischaracterize the minor corrections.......................................... 6

        ii.   Commerce appropriately verified the information and exercised its discretion in declining to reject it. ..................................................... 11

        iii.  No basis in law or fact exists to apply Facts Available or Adverse Facts Available 14

    B.    Commerce's Treatment of OMSA's U.S. Onward Sales As CEP Transactions Is Supported by Substantial Evidence or Otherwise in Accordance with Law .................. 16

V.    CONCLUSION.................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AK Steel Corp. v. United States*,
226 F.3d 1361, 1367-74 (Fed. Cir. 2000) ................................................................. 20

*Allied Tube and Conduit Corp. v. United States*,
127 F. Supp. 2d 207, 218–19 (Ct. Int'l Trade 2000) ................................................ 22

*Altx, Inc. v. United States*,
167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001) .................................................. 8

*Atlantic Sugar, Ltd. v. United States*,
744 F.2d 1556, 1562 (Fed. Cir. 1984) ...................................................................... 8

*Chemours Company FC, LLC v. United States*,
443 F. Supp. 3d 1315, 1321 (Ct. Int'l Trade 2020) .................................................. 8

*Coalition for Preservation of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*,
44 F. Supp. 2d 229, 236 (Ct. Int'l Trade 1999) ........................................................ 17

*Goodluck India Ltd. v. United States*,
11 F.4th 1335, 1343 (Fed. Cir. 2021) ....................................................................... 15

*In re NuVasive, Inc.*,
842 F.3d 1376, 1382 (Fed. Cir. 2016) ...................................................................... 8

*Nippon Steel Corp. v. United States*,
337 F.3d 1373, 1379 (Fed. Cir. 2003) ...................................................................... 8

*NTN Bearing Corp. v. United States*,
74 F.3d 1204, 1208 (Fed. Cir. 1995) ........................................................................ 22

*Nucor Corp. v. United States*,
612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ............................................................ 21

*Solid Urea from the Russian Federation*,
75 Fed. Reg. 51,440 (Dep't of Commerce Aug. 20, 2010) ...................................... 19

*Universal Camera Corp. v. NLRB*,
340 U.S. 474, 487 (1951) .......................................................................................... 8

*Zhejiang DunAn Hetian Metal Co. v. United States*,
652 F.3d 1333, 1348 (Fed. Cir. 2011) ...................................................................... 17

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) .................................................................................................. 8

19 U.S.C. § 1677a(a) ............................................................................................................... 20

19 U.S.C. § 1677a(b) .............................................................................................................. 20

19 U.S.C. § 1677m(e) ........................................................................................................ 16, 17

19 U.S.C. §§ 1677m(c)(1) ...................................................................................................... 16

**Regulations**

19 C.F.R. § 351.401(i) ....................................................................................................... 18, 19

**Other Authorities**

*Ferrosilicon from Brazil, Kazakhstan, Malaysia, and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations*, 89 Fed. Reg. 31,137 (Dep't of Commerce, Apr. 24, 2024).... 5

*Ferrosilicon From Malaysia: Amended Final Determination of Sales at Less than Fair Value,* 90 Fed. Reg. 21,456 (Dep't of Commerce, May 20, 2025) .............................................................. 8

*Ferrosilicon From Malaysia: Amended Final Determination of Sales at Less Than Fair Value; Ferrosilicon From Brazil, Kazakhstan, and Malaysia: Antidumping Duty Orders*, 90 Fed. Reg. 21,456 (Dep't of Commerce, May 20, 2025) ............................................................................ 4

*Ferrosilicon From Malaysia: Amended Preliminary Determination of Sales at Less Than Fair Value and Amended Preliminary Negative Determination of Critical Circumstances*, 89 Fed. Reg. 99,829 (Dept. of Commerce Dec. 11, 2024) ...................................................................... 6

*Ferrosilicon from Malaysia: Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Negative Determination of Critical Circumstances*, 90 Fed. Reg. 14,105 (Dep't of Commerce, Mar. 28, 2025) ................................................................................................. 4

*Ferrosilicon From Malaysia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures,* 89 Fed. Reg. 88,010 (Dep't of Commerce, Nov. 6, 2024) ................................................................................................. 6

## I.    RULE 56.2 STATEMENT

Defendant-Intervenor OM Materials Sarawak SDN BHD ("OMSA"), respondent in the underlying investigation, respectfully submits this response to the Rule 56.2 motion for judgment on the agency record filed in this case by Plaintiffs CC Metals and Alloys, LLC and Ferroglobe USA, Inc. (collectively, "Petitioners"), ECF No. 29.

### A.  Administrative Determination to Be Reviewed

The administrative determination under review is the Final Determination issued by Commerce in the antidumping duty ("AD") investigation of ferrosilicon from Malaysia (Case No. A-557-828), covering the period of investigation ("POI") of January 1, 2023, through December 31, 2023. Notice of the final determination was published in the *Federal Register* on March 28, 2025. *See Ferrosilicon from Malaysia: Final Affirmative Determination of Sales at Less-Than-Fair-Value and Final Negative Determination of Critical Circumstances*, 90 Fed. Reg. 14,105 (Dep't of Commerce, Mar. 28, 2025) ("Final Determination"); *see also* accompanying *Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less-Than-Fair-Value in the Investigation of Ferrosilicon from Malaysia* (Mar. 28, 2025), P.R. 241.  Commerce published the Order, based on the Final Determination, in the *Federal Register* on May 20, 2025. *See Ferrosilicon From Malaysia: Amended Final Determination of Sales at Less Than Fair Value; Ferrosilicon From Brazil, Kazakhstan, and Malaysia: Antidumping Duty Orders*, 90 Fed. Reg. 21,456 (Dep't of Commerce, May 20, 2025) ("Order").

## II.   STATEMENT OF FACTS

On March 28, 2024, CC Metals and Alloys, LLC and Ferroglobe USA, Inc. (collectively "Petitioners") filed a petition for antidumping duty ("AD") measures on imports of ferrosilicon from Brazil, Kazakhstan, Malaysia, and Russia. Commerce initiated AD investigations on April

1

17, 2024. *See Ferrosilicon from Brazil, Kazakhstan, Malaysia, and the Russian Federation: Initiation of Less-Than-Fair-Value Investigations*, 89 Fed. Reg. 31,137 (Dep't of Commerce, Apr. 24, 2024).

Commerce selected OMSA and Pertama Ferroalloys SDN BHD ("Pertama") as mandatory respondents in its less-than-fair-value (LTFV) investigation. *See Memorandum to James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, from Michael J. Heaney, Peter K. Farrell, International Trade Compliance Analysts, Office VI, Antidumping and Countervailing Duty Operations, Less-Than-Fair-Value Investigation of Ferrosilicon from Malaysia: Respondent Selection*, (May 9, 2024), P.R. 34; C.R. 14.

Commerce issued its initial questionnaire, and OMSA submitted timely responses to sections A, B, C, and D of Commerce's initial questionnaire and provided other relevant information required by Commerce. *See Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, OMSAs Section A Questionnaire Response*, (Jul. 2, 2024) ("OMSA's AQR"), P.R. 55; C.R. 16; *Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, OMSA's Sections B-C Questionnaire Response*, (Jul. 18, 2024) ("OMSA's BCQR"), P.R. 91; C.R. 67; *Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, OMSA's Section D Questionnaire Response*, (Jul. 30, 2024) ("OMSA's DQR") P.R. 97; C.R. 74. In its Section A response, OMSA explained that it managed all of its U.S. sales through an affiliated Malaysian entity, OM Materials (S) Pte Ltd. ("OMS"), and that it sold subject merchandise to the United States during the period of investigation ("POI") via two sales channels.

Commerce subsequently issued supplemental questionnaires, to which OMSA timely responded. *See Letter from Baker McKenzie LLP to the Hon. Gina Raimondo, OMSA's Section*

*A-C Supplemental Questionnaire Response* (Oct. 8, 2024) ("OMSA's A-C SQR1"), P.R. 129; C.R. 143.

On November 6, 2024, Commerce published its Preliminary Determination. *See Ferrosilicon From Malaysia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Negative Determination of Critical Circumstances, Postponement of Final Determination, and Extension of Provisional Measures,* 89 Fed. Reg. 88,010 (Dep't of Commerce, Nov. 6, 2024) ("Preliminary Determination"), P.R. 167; *see also accompanying Decision Memorandum for the Preliminary Affirmative Determination in the Less-Than-Fair-Value Investigation of Ferrosilicon from Malaysia*, (Oct. 31, 2024) ("Preliminary IDM"), P.R. 149. Commerce applied its standard practice, using the earlier of the shipment date or invoice date as the date of sale for all of OMSA's U.S. sales. In December 2024, Commerce amended the Preliminary Determination to correct ministerial errors, resulting in a revised preliminary weighted-average dumping margin of 19.48 percent. *See Ferrosilicon From Malaysia: Amended Preliminary Determination of Sales at Less Than Fair Value and Amended Preliminary Negative Determination of Critical Circumstances*, 89 Fed. Reg. 99,829 (Dept. of Commerce Dec. 11, 2024).

After Commerce issued its Preliminary Determination, Commerce conducted cost and sales verifications of OMSA. *See Verification of the Cost Response of OM Materials (Sarawak) Sdn. Bhd. in the Less-Than-Fair-Value Investigation of Ferrosilicon from Malaysia*, (Feb. 12, 2025) ("Cost Verification Report"), P.R. 224; C.R. 374*; Verification of the Sales Response of OM Materials (Sarawak) Sdn. Bhd. and OM Materials (S) Pte Ltd. in the Less-Than-Fair-Value Investigation of Ferrosilicon from Malaysia*, (Feb. 12, 2025) ("Sales Verification Report") P.R. 222; C.R. 361. Commerce's verification agendas expressly notified the parties that new

information would be accepted at verification when, *inter alia*, the information made minor corrections to information already on the record, or the information corroborated, supported, or clarified information already on the record. *See Letter from Erin Kearney, Program Manager, AD/CVD Operations, Office VI, to OM Materials (Sarawak) Sdn Bhd, Less-Than-Fair-Value Investigation of Ferrosilicon from Malaysia: Verification Agenda* (Jan. 6, 2025), P.R. 199; C.R. 314 at 2; *Letter from Gina K. Lee, Lead Accountant, Office of Accounting, Enforcement and Compliance, to OM Materials (Sarawak) Sdn Bhd, Less-Than-Fair-Value Investigation of Ferrosilicon from Malaysia: Cost Verification Agenda* (Oct. 22, 2024), P.R. 142; C.R. 233 at 2.

Both Petitioners and OMSA submitted case and rebuttal briefs. *See OMSA's Case Brief* (Feb. 25, 2025) ("OMSA's Case Brief"), P.R. 229; C.R. 376; *Petitioners' Case Brief* (Feb. 25, 2025), P.R. 230; C.R. 377; *OMSA's Rebuttal Brief* (Mar. 3, 2025), P.R. 231; C.R. 378; *Petitioners' Rebuttal Brief* (Mar. 3, 2025), P.R. 232; C.R. 379. In their case brief, Petitioners challenged OMSA's CONNUM corrections and requested that Commerce apply total facts available with an adverse inference. Petitioners' Case Brief at 4–13. OMSA argued in its rebuttal brief that its CONNUM corrections were minor, explaining that the revision resulted in a one-to-one replacement of each CONNUM without any reporting changes and had no practical effect on the integrity of its reported data. OMSA's Rebuttal Brief at 4–5. In its case brief, OMSA also requested that Commerce revise the date of sale for the onward sales to the final invoice date, consistent with the verified record evidence demonstrating that the material terms of those sales were not set until the final invoice. OMSA's Case Brief at 4–5.

On March 28, 2025, Commerce issued its Final Determination. *See Ferrosilicon From Malaysia: Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances,* 90 Fed. Reg. 14,105 (Dep't of Commerce Mar. 28,

4

2025); *see also* accompanying *Issues and Decision Memorandum for the Final Affirmative Determination of Sales at Less-Than-Fair-Value in the Investigation of Ferrosilicon from Malaysia* (Mar. 28, 2025) ("IDM"), P.R. 241.

With respect to the CONNUM corrections, Commerce continued to accept OMSA's revised CONNUMs. Commerce found that the revisions "resulted in a one-to-one replacement of the CONNUMs," that "the sales reporting was not affected," and that "no new CONNUMs were created, there was no shifting of CONNUMs, and the change in CONNUM coding reflected the physical characteristics more accurately." IDM at 8–9, P.R. 241. Commerce concluded that the corrections did not "have a significant impact or call into question the overall integrity of OMSA's reported data." *Id.* at 9, P.R. 241.

With respect to the date of sale, Commerce determined that for OMSA's onward sales, the final invoice date was the "appropriate date of sale" because "the sales terms remain open to negotiation and the parties have discretion to set prices until the onward sale is finalized." IDM at 17, P.R. 241. Because the date of sale for the onward sales occurred after the date of importation, Commerce categorized those sales as constructed export price ("CEP") transactions. *Id.*

In May 2025, Commerce published the antidumping duty order covering ferrosilicon from Malaysia. *See Ferrosilicon From Malaysia: Amended Final Determination of Sales at Less than Fair Value,* 90 Fed. Reg. 21,456 (Dep't of Commerce, May 20, 2025).

## III.    STANDARD OF REVIEW

This Court must "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

To satisfy the "substantial evidence" standard, Commerce must take into account "the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *see also Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003). And the Court may not sustain Commerce's determination "without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951).

In order to satisfy the "substantial evidence" standard, Commerce must also provide a reasoned explanation for its determination. To do so, it must "make the necessary findings and have an adequate evidentiary basis for its findings," which requires "examin{ing} the relevant data and articulat{ing} a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Chemours Company FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1321 (Ct. Int'l Trade 2020) (citing *In re NuVasive, Inc.*, 842 F.3d 1376, 1382 (Fed. Cir. 2016)). Commerce "must address significant arguments and evidence which seriously undermines its reasoning and conclusions." *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001).

## IV.   ARGUMENT

### A.  Commerce's Acceptance of OMSA's Corrected CONNUM Reporting Was Not an Abuse of Discretion or Unlawful

Commerce's decision to accept OMSA's revised CONNUM reporting methodology at verification was not an abuse of discretion.

#### i.   Plaintiffs mischaracterize the minor corrections

Plaintiffs contend that CONNUM code changes which Commerce accepted as minor corrections during OMSA's cost and sales verifications resulted in new, additional CONNUMs

and caused changes to OMSA's home market sales reporting, and consequently were not appropriate to accept as a minor correction. As Defendant explains in its response brief, Plaintiffs "rely mainly on the optics of the revision" instead of the evidence, Pl. Br. at 8, seeking to characterize the minor corrections as extreme and unwarranted changes. However, the record of the proceeding supports Commerce's conclusion that the corrections OMSA submitted were appropriate, accurate, and verifiable.

In addition to the explanations provided in Defendant's response brief, Defendant-Intervenors further clarify the factual record to demonstrate that Plaintiffs' claim relies on a conflation of two different minor corrections and the corrections' effects (or lack thereof) on OMSA's reporting and Commerce's dumping analysis. When these two minor corrections and their effects are analyzed accurately, they cannot be characterized any way other than minor and appropriate corrections for Commerce to have accepted.

The evidence supporting Commerce's determination is found largely in the cost and sales verification reports and the accompanying minor corrections exhibits, which make clear that OMSA presented two different minor corrections relevant to reported CONNUMs. *OMSA Cost Verification Report* (Feb. 12, 2025), P.R. 224; C.R. 374, and *Letter from Baker McKenzie LLP to the Hon. Gina Raimondo re: Ferrosilicon from Malaysia: OMSA's Cost Verification Exhibits* (Nov. 15, 2024) ("Cost Verification Exhibits"), P.R. 174; C.R. 264 – 271; *OMSA Sales Verification Report* (Feb. 12, 2025), P.R. 222; C.R. 361; *Letter from Baker McKenzie LLP to the Hon. Gina Raimondo*, *OMSA's Resubmission of Sales and Cost Verification Minor Corrections* (Feb. 10, 2025) ("*OMSA's Minor Corrections*"), P.R. 217; C.R. 353, at VE-1 & SVE-1.

Minor Correction 1: The first minor correction pertains to the codes identified to construct the CONNUMs, and in particular, the codes used for titanium, manganese, carbon, and

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED    NON-CONFIDENTIAL VERSION

phosphorous. For each of the **[      ]** CONNUMs reported, OMSA revised the codes for these certain characteristics to more accurately reflect the physical characteristics in accordance with OMSA's test reports instead of using the broader, and sometimes silent, allowances for these elements under the sales contract. *See* Cost Verification Report at 3. When these revisions were implemented and in turn accepted by Commerce, each of the original **[     ]** CONNUMs remained within their own same, separate CONNUM grouping. No new CONNUMs were created and none of the CONNUMs shifted or merged into different groupings as a result of this correction. In total, the change had no practical effect.

To illustrate using an example, with respect to the cost database, all production related to the original CONNUM **[                    ]** remained reported for the revised CONNUM **[          ]**. The cost reporting was therefore not affected by this revision.

The same is true for OMSA's home market and U.S. sales reporting. The CONNUM coding revisions did not affect OMSA's sales reporting. For example, all sales reported in both the home market and U.S. sales databases of merchandise with the original CONNUM **[            ]** remained reported for the revised CONNUM **[                ]** – with one exception for a separate reason/correction. The one exception relates to the CONNUM correction for one home market sale (SEQH **[     ]**), for which OMSA incorrectly reported the **[          ]** (and which OMSA addresses below).

In total, the CONNUM coding revision resulted in a one-to-one replacement of the CONNUMs without any reporting changes. *See* Cost Verification Exhibits at Exhibit CVE-1, Attachment E; Sales Verification Exhibits at Exhibit SVE-1, Attachment A. OMSA depicts in the following chart the one-to-one relationship between the original and revised CONNUMS:

| | Original CONNUM | Revised CONNUM | |
|---|---|---|---|
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |

The one-to-one replacement is also evident in the table that Plaintiffs have included in their opening brief, Pl. Br. at 23, where Plaintiffs attempt to portray the CONNUM coding revisions as having resulted in home market sales reporting revisions. As portrayed by Plaintiffs' table, all previously reported CONNUMs would appear to be entirely nullified and replaced with the new CONNUMs.  In fact, however, there are no additional CONNUMs. And, absent a different revision related to the reporting of SEQH **[    ]**, the cost, home market sales, and U.S. sales reporting remain the same. Plaintiffs' portrayal therefore undermines their own claims, and validates that OMSA's CONNUM coding changes were properly treated as a minor correction during the cost and sales verifications.

Minor Correction 2: As noted above, the second correction related to the reporting of the silicon **[        ]** for SEQH **[    ]**. In its home market sales database, OMSA inadvertently reported the merchandise pertaining to this sale as having a **[                    ]**. However, in preparation for the verifications, OMSA discovered that the correct **[**

**]** based on the test report for this sale. Thus, if OMSA corrected the original CONNUM, it would be **[                ]**. When incorporating this correction with the CONNUM coding correction the CONNUM is then revised to **[                ]**. The result

9

is that the total quantity of CONNUM **[                    ]** reported in the home market sales

database would increase by the quantity of this sale, and the total quantity of CONNUM **[**

**]** would correspondingly decrease by the quantity of this sale. And that is exactly

what the table from Plaintiffs opening brief demonstrates, as reproduced below to highlight this

fact:

The total quantity of SEQH **[      ]** is **[            ]** metric tons, and that is the exact amount

by which each of the relevant CONNUMs increase or decrease. The difference between

**[                                                                              ]**.

The change in quantities reported are a result of this minor correction and not the CONNUM

coding correction discussed above.

Nevertheless, Plaintiffs take the resulting output from these two minor corrections to

allege that a "wholly new, unsolicited . . . fundamental methodological change" took place

during verification. To support this allegation, Plaintiffs provide the table reprinted above and

10

claim that revisions in the reported home market sales quantities depicted in the table were a consequence of the CONNUM coding minor correction. Pl. Br. At 23. Plaintiffs' claim is unfounded and should be rejected in its entirety.

Further clarification of the silicon code correction: Defendant correctly notes in its response brief that a different minor correction took place with respect to one sale, Pl. Br. at 6, 13, which, for the reasons explained, was independent and appropriate. The exception relates to the CONNUM correction for one home market sale (SEQH [      ]), for which OMSA incorrectly reported the [                    ]. The CONNUM coding correction did not have any practical effect, and the silicon code correction for SEQH [      ] affected only one home market sale. In other words – but for a different revision related to the reporting of SEQH [      ], the cost, home market sales, and U.S. sales reporting remains the same.

Plaintiffs had claimed in the underlying proceeding that the revision to the SEQH [      ] CONNUM was [                ] because it would result in revisions to [      ] of the reported home market sales CONNUMs and thus [      ]% of the reported quantities. See Petitioners' Case Brief, P.R. 230; C.R. 377 at 12. However, this explanation of the effect of the SEQH [      ] silicon CONNUM code minor correction had no factual basis. The change affected only one sale – SEQH [      ] – and did not affect any other CONNUM or any other reported quantities. The other CONNUM coding corrections, as explained above, were distinct from this correction. Accordingly, Commerce correctly concluded that this correction therefore is [                    ].

**ii.      Commerce appropriately verified the information and exercised its discretion in declining to reject it.**

As Defendant explains, Commerce fully verified the information related to the minor corrections during verification with OMSA. See Def. Br. at 12, 14. The verification reports and exhibits demonstrate the steps that Commerce took to satisfy itself that the changes were based

11

on verifiable documentation. *See* IDM at 8-9, P.R. 241; *OMSA Cost Verification Report* (Feb. 12, 2025), P.R. 224; C.R. 374, and *Letter from Baker McKenzie LLP to the Hon. Gina Raimondo re: Ferrosilicon from Malaysia: OMSA's Cost Verification Exhibits* (Nov. 15, 2024) ("*Cost Verification Exhibits*"), P.R. 174; C.R. 264-271; *See Letter from Baker McKenzie LLP to the Hon. Gina Raimondo*, *OMSA Sales Verification Exhibits* (Jan. 24, 2025) ("*OMSA Verification Exhibits*"), P.R. 205; C.R. 328-342. Specifically, Commerce reported:

> Company officials explained that for the reported CONNUM codes for calcium, carbon, titanium, sulfur, phosphorous, and manganese content, OMSA initially used the tolerances allowed under its sales contracts to construct the code for each of these chemical characteristics. However, when preparing for the cost verification, OMSA reviewed its production records and the chemical characteristics identified in its test reports and determined that it used the incorrect code for titanium and manganese content for all CONNUMs, and the incorrect code for carbon and phosphorus content for **[          ]**. OMSA revised the CONNUMs codes in accordance with its test reports. We reviewed the sales contract for all sales of MUC during the POI and confirmed that the CONNUM assignments are now based on the test reports. This correction does not have any impact on the reported costs. *See* Attachment E of CVE-1.

*OMSA Cost Verification Report* (Feb. 12, 2025), P.R. 224; C.R. 374, at 3.

In the final determination, Commerce concluded that the CONNUM revisions "resulted in a one-to-one replacement of the CONNUMs," and, apart from the one sale affected by the independent correction, "the sales reporting was not affected, *e.g.*, all sales originally reported as CONNUM A remain reported for revised CONNUM A." IDM at 8-9, P.R. 241. Commerce concluded the revisions did not "have a significant impact or call into question the overall integrity of OMSA's reported data." *Id.* at 9. "Considering that no new CONNUMS were created, there was no shifting of CONNUMs, and the change in CONNUM coding reflected the

12

physical characteristics more accurately, we accepted the changes are minor corrections." *Id.*[1]

Thus, recognizing that the corrections were isolated and easily correctible, Commerce

appropriately exercised its discretion to accept minor corrections under these circumstances.

This is in contrast to the proceedings in which responding companies sought to use the

minor corrections process to remedy deficient and incomplete datasets, such as in *Goodluck*

*India* and *Steel Pipe From Russia*. *See Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343

(Fed. Cir. 2021) ("*Goodluck India*"); *Seamless Carbon and Alloy Steel Standard, Line, and*

*Pressure Pipe From the Russian Federation: Final Affirmative Determination of Sales at Less*

*Than Fair Value*, 86 Fed. Reg. 35269 (Dep't of Commerce July 2, 2021) ("*Steel Pipe from*

*Russia*") and accompanying Issues and Decision Memorandum, ("Steel Pipe from Russia IDM").

In *Goodluck India*, the respondent failed to use updated CONNUM codes, resulting in 24

misreported CONNUMs and 13 additional, unreported CONNUMs that ultimately caused

significant changes to the allocation of costs and the product matches between U.S. and home

market sales. *See Goodluck India*, 11 F.4th at 1343. Similarly, in *Steel Pipe from Russia*, the

Department rejected the minor corrections related to the respondent's CONNUM reporting

because the correction would have affected "the selection of home market matches ***for most***

***products*** sold in the United States." *Steel Pipe from Russia* IDM at 5 (emphasis added).

The facts in this investigation are not comparable to those in *Goodluck India* or *Steel*

*Pipe from Russia*. Here, as noted, the CONNUM coding correction did not change any cost

allocations or product matches. Nor does the silicon code correction for SEQH **[      ]** require

---

[1] With respect to Plaintiffs' characterization of the Exhibit SVE-1 as a "totally unknown" exhibit, Def. Br. at 28, it is evident from the face of the document itself that it was obtained during verification in response to Commerce officials' verification inquiries.

amendments to the cost allocations, and it affected the product matching only for one sale. Given the limited nature of the changes here, Commerce correctly exercised its discretion to accept these as minor corrections.

### iii. No basis in law or fact exists to apply Facts Available or Adverse Facts Available

Plaintiffs ask this Court to direct Commerce to impose an adverse rate of 162 percent or to direct Commerce to reject the minor corrections presented at verification. Pl. Br. at 21, 29-30. There is no basis in law, nor in the record of this proceeding, to support such a conclusion. The sections above demonstrate that Plaintiffs' claims are unfounded and that the application of facts available or adverse facts available is unwarranted.

Section 1677e(a) of the statute defines the conditions under which Commerce may resort to facts available in making its determination, and no determination to apply adverse facts available may be made without that prerequisite finding. Those conditions are: (1) necessary information is not available on the record; or (2) a respondent has either withheld requested information, failed to provide requested information by the established deadlines or in the form and manner requested (subject to 19 U.S.C. §§ 1677m(c)(1) and (e)), significantly impeded the proceeding, or provided unverifiable information. The U.S. Court of Appeals for the Federal Circuit has stated that, "under the plain language of § 1677e(a), it is clear that Commerce can only use facts otherwise available to fill a gap in the record." *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1348 (Fed. Cir. 2011). In other words, Commerce may not apply facts available "in disregard of information of record that is not missing or otherwise deficient." *Id*.

Here, the conditions for resorting to facts available (and therefore adverse facts available) were not satisfied. First, the record clearly shows that necessary information was and remained

NON-CONFIDENTIAL VERSION

available. Plaintiffs do not contend that complete information was not available. Instead, they simply take issue with whether corrections and updated information qualify as minor corrections. The discussion in the sections above confirm that these corrections are indeed minor, and that Plaintiffs' attempts to characterize them differently are not supported by the record, the Department's practice, or court precedent. *See Coalition for Preservation of Am. Brake Drum & Rotor Aftermarket Mfrs,* 44 F. Supp. 2d 229, 236 (Ct. Int'l Trade 1999); *Steel Wire Rod from Mexico* IDM at 12. Second, OMSA provided all relevant information in a timely manner, presented any minor corrections to Commerce at the appropriate time during verification, and Commerce officials were able to verify the submitted and corrected information. Because all of the corrections were minor, and there are no allegations that information was otherwise missing from the record, and Commerce successfully verified all of the information, there is no basis to find that there are gaps in the record or that OMSA impeded the proceeding in any way. Therefore, there is no factual or legal justification to apply facts available.

Moreover, even if the conditions for facts available were satisfied (which they are not), the statute prescribes conditions under which Commerce would nevertheless be required to utilize the respondent's responses instead of applying facts available, or even adverse facts available. Specifically, 19 U.S.C. § 1677m(e) precluded Commerce from rejecting submitted information if (1) the information was submitted by the established deadlines; (2) the information is verifiable; (3) the information is not so incomplete that it cannot be reliable; (4) the respondent acted to the best of its ability; and (5) it would not be difficult for the Department to use the information. Therefore, the conditions listed in § 1677m(e) would still require Commerce use the respondent's submitted information instead of FA or AFA.

15

As noted above, OMSA (1) submitted all requested information, including minor corrections, by the deadlines prescribed by Commerce; (2) Commerce officials verified the information without issue; (3) the information was complete and the record contained no evidence to the contrary; (4) OMSA acted to the best of its ability in providing timely and complete responses; and (5) it was not difficult for Commerce to use the information. Nothing on the record would support a different conclusion. Consequently, even if this Court were to remand the determination, there is no basis upon which Commerce could apply adverse facts available to OMSA and disregard the information it submitted.

**B. Commerce's Treatment of OMSA's U.S. Onward Sales As CEP Transactions Is Supported by Substantial Evidence or Otherwise in Accordance with Law**

Commerce's determination that the final invoice date should be the date of sale for OMSA's onward U.S. sales, and its reclassification of onward sales as CEP sales was supported by substantial evidence on the record and not otherwise contrary to law.

Commerce's regulations establish that the date of invoice is normally the date of sale of the subject merchandise or foreign like product. 19 C.F.R. § 351.401(i). Commerce may use a date other than the invoice date only if it "is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale." *Id.*

Here, Commerce evaluated the record and correctly distinguished between OMSA's two types of sales. For OMSA's sales with prices fixed to the CRU index, Commerce found that the "formulaic pricing" practice applied because "the price is fixed to the CRU index price for a stated period" and "there is nothing more for the parties to negotiate." IDM at 16, P.R. 241. Accordingly, Commerce used the earlier of shipment or invoice date as the date of sale for those transactions, consistent with its well-established practice. *See Solid Urea from the Russian Federation*, 75 Fed. Reg. 51,440 (Dep't of Commerce Aug. 20, 2010). However, Commerce

16

correctly found that this practice "does not apply to OMSA's sales for which the price is calculated based on the onward sale in the United States between the trader and the end customer, as the sales terms remain open to negotiation and the parties have discretion to set prices until the onward sale is finalized." IDM at 17, P.R. 241.

This finding is well-supported by the record. Commerce verified a **[**

**]** sale where the final price is contingent on an onward sale in the United States. *See* Sales Verification Exhibit 5 at 3–6. OMSA's company officials explained that for **[**

**]** sales, the final price was calculated based on the onward sale in the United States. OMSA Sales Verification Report at 6–7. Unlike CRU-indexed sales, where price was determined by a published index agreed upon at the time of contract, the onward sales prices depended on negotiations between the trader and the ultimate U.S. customer, a process over which neither OMSA nor the contracting parties had predetermined the outcome. Because the material terms of the onward sales were not established until the final invoice, Commerce properly determined the invoice date to be the date of sale, consistent with 19 C.F.R. § 351.401(i).

Once Commerce determined that the date of sale for the onward sales was the final invoice date, the statute did not leave Commerce discretion regarding the classification of those sales. Section 772(a) of the Tariff Act of 1930 defines export price (EP) as the price at which subject merchandise "is first sold (or agreed to be sold) *before the date of importation*." 19 U.S.C. § 1677a(a) (*emphasis* added). Section 772(b) defines constructed export price (CEP) as the price at which subject merchandise "is first sold (or agreed to be sold) in the United States *before or after the date of importation*." 19 U.S.C. § 1677a(b) (*emphasis* added); *see also AK Steel Corp. v. United States*, 226 F.3d 1361, 1367-74 (Fed. Cir. 2000) (analyzing distinctions between EP and CEP sales). Because OMSA's onward sales occurred in the United States and

17

after importation, they cannot be classified as EP sales. As Commerce explained, "[b]ased on the plain language of the statute, which defines EP sales as sales 'before the date of importation,' the sales at issue may not be classified as EP sales." IDM at 17, P.R. 241.

Plaintiffs emphasize that OMSA initially reported all U.S. sales as EP transactions and "affirmatively reported" in its questionnaire responses that there were no CEP sales. Pl. Br. at 41. Commerce is not bound by a respondent's initial characterization of its sales; rather, it must determine the proper treatment based on the full record, including verification findings and post-preliminary briefing. Once Commerce determined, based on verified evidence, that the date of sale for onward sales occurred after importation, the statute dictated that such sales cannot be classified as EP and must be treated as CEP transactions.

Plaintiffs also contend that "OMSA used the same procedures and paperwork" for all U.S. sales, "whether those sales involved prices tied to the CRU index or prices determined in discussions between the unaffiliated traders and ultimate U.S. customers," and that "OMSA treated all of its U.S. sales essentially the same." Pl. Br. at 35.

Commerce reasonably found that, unlike index-priced sales, onward sales "remain open to negotiation" until the final invoice, because the price depends on a separate, later transaction. IDM at 17, P.R. 241. The final invoice is issued only after the final price is determined based on the onward sale in the United States. This is apparent in the "procedures and paperwork" for OMSA's U.S. sales. As OMSA explained in its Section A Supplemental Questionnaire response, for "U.S. sales made on a [         ] basis, OMS issues a provisional and final invoice. The provisional invoice [                    ] of the merchandise. The final invoice [

]. The final invoice [                                                    ]. For U.S. sales

18

HAS BEEN DELETED
NON-CONFIDENTIAL VERSION

made on a **[       ]** basis, OMS issues **[**

**]. The [**

**].** OMSA's A-C SQR1 at 13-14. OMSA further provided detailed documentation showing how it accounts for provisional and final invoices in its sales ledger and accounting system, which "includes **[                                    ].**" *Id.* at 14*; see also* Exhibit SQA-5.

In addition, Plaintiffs invoke *Nucor Corp. v. United States*, 612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009), noting that "Commerce has a well-established practice of looking to "the parties' actual course of conduct, as well as the parties' expectations concerning the transaction." Pl. Br. at 38. Plaintiffs argue that OMSA's conduct on the record reflects a singular "course of conduct" and set of expectations; OMSA consistently treated its onward U.S. sales…as if the material terms were finalized at shipment." *Id*. Plaintiffs argue that Commerce should have considered three key factors in changing the date of sale, as held in *Nucor Corp*.; those are whether: 1. The shift to the final invoice date for the onward sales in the investigation reflected the "meeting of the minds of the material terms of sale" given the substantial evidence on the record; 2. That shift resulted in a calculation of OMSA's AD margin "on a fair and equitable basis;" and 3. The ultimate result of the change to Commerce's calculations satisfied "Commerce's overarching obligation to determine dumping margins as accurately as possible." *Id*. at 40.

Plaintiffs misstate the *Nucor* framework. As Commerce correctly notes, *Nucor* identifies only one key factor for selecting the date of sale: the "meeting of the minds of the material terms

19

BUSINESS PROPRIETARY
INFORMATION
HAS BEEN DELETED            NON-CONFIDENTIAL VERSION

of sale." Def. Br. at 20–21. The other factors Plaintiffs invoke are general principles drawn from other cases that *Nucor* cited, not independent criteria for the date of sale determination. *See Nucor*, 612 F. Supp. 2d at 1308 (citing *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995), and *Allied Tube and Conduit Corp. v. United States*, 127 F. Supp. 2d 207, 218–19 (Ct. Int'l Trade 2000), for the general principles that Commerce must calculate margins "as accurately as possible" and "on a fair and equitable basis").

Furthermore, the record evidence confirms that a "meeting of the minds of the material terms of sale" did not occur until the final invoice date. Contrary to Plaintiffs' assertion that OMSA's "course of conduct" reflects finalization at shipment, OMSA's Section A Supplemental Questionnaire response establishes that shipment and provisional invoicing occur before the material term, price, is fixed. For OMSA's onward U.S. sales, **[**

**]** the final price is determined. **[**

**]**. Commerce's determination that the final invoice date reflects the "meeting of the minds" is consistent with *Nucor* and supported by substantial evidence.

20

**NON-CONFIDENTIAL VERSION**

## V.    CONCLUSION

For the reasons explained above, we respectfully request that this Court deny the

Plaintiffs' motion, sustain Commerce's final determination, and enter judgment for the United

States.


Dated: May 8, 2026                              Respectfully submitted,

                                                */s/ Christine M. Streatfeild*
                                                Christine M. Streatfeild
                                                Nathaniel J. Halvorson
                                                Baker & McKenzie LLP
                                                815 Connecticut Avenue, N.W.
                                                Washington, DC 20006-4078
                                                Tel.: (202) 835-6111
                                                christine.streatfeild@bakermckenzie.com

                                                *Counsel to Defendant-Intervenor OM*
                                                *Materials (Sarawak) Sdn. Bhd.*

**<u>CERTIFICATE OF COMPLIANCE</u>**

The undersigned hereby certifies that the attached Memorandum of Law in Support of Defendant-Intervenor OM Materials (Sarawak) Sdn. Bhd. Rule 56.2 Motion for Judgment on the Agency Record, filed May 8, 2026, contains 5902 words, including headings, footnotes, and quotations, and excluding the cover page, table of contents, table of authorities, counsel's signature block, and this certificate, according to the word count function of the word-processing system used to prepare this brief, and therefore complies with the maximum 14,000 word count limitation set forth in the Scheduling Order issued by the Court on September 23, 2025 (ECF No. 26).

Dated: May 8, 2026                                        Respectfully submitted,

                                                                 */s/ Christine M. Streatfeild*
                                                                 Christine M. Streatfeild
                                                                 Nathaniel J. Halvorson
                                                                 Baker & McKenzie LLP
                                                                 815 Connecticut Avenue, N.W.
                                                                 Washington, DC 20006-4078
                                                                 Tel.: (202) 835-6111
                                                                 christine.streatfeild@bakermckenzie.com

                                                                 *Counsel to Defendant-Intervenor OM*
                                                                 *Materials (Sarawak) Sdn. Bhd.*